THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
STEVEN E. SCHWARTZ, Defendant-Appellant.

Second District   No. 83—0552

Opinion filed August 12, 1985.

630

G. Joseph Weller and Kathleen J. Hamill, both of State Appellate Defender's Office, of Elgin, for appellant.

Robert J. Morrow, State's Attorney, of Geneva (Phyllis J. Perko and Sally A. Swiss, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE REINHARD delivered the opinion of the court:

Defendant, Steven E. Schwartz, was charged by indictment with two counts of murder (Ill. Rev. Stat. 1981, ch. 38, par. 9—1(a)(1)), aggravated arson (Ill. Rev. Stat. 1981, ch. 38, par. 20—1.1(a)(3)), and arson (Ill. Rev. Stat. 1981, ch. 38, par. 20—1(a)), and, following a jury trial, was found not guilty by reason of insanity of murder, and guilty but mentally ill of both aggravated arson and arson. Defendant was sentenced to a 14-year term of imprisonment for aggravated arson to be served concurrently with a five-year term of imprisonment imposed for arson. Defendant was remanded to the Department of Corrections for imprisonment after he was found not to be in need of in-patient mental health services by the Department of Mental Health and Developmental Disabilities following the verdict of not guilty of murder by reason of insanity. Ill. Rev. Stat. 1983, ch. 38, par. 1005—2—4.

Defendant raises four issues for our review: (1) whether the trial court's finding that defendant's amnesia as to the events on the day of the offenses did not preclude him from effectively establishing the defense of insanity so that he was fit to stand trial, was error; (2) whether the defendant's conviction for aggravated arson must be reversed under our decision in *People v. Wick* (1984), 121 Ill. App. 3d 94, 458 N.E.2d 1387, which declared unconstitutional the same subsection of the aggravated arson statute under which defendant was convicted here; (3) whether the State failed to prove beyond a reasonable doubt that defendant was sane when he started the fire so that his conviction for aggravated arson and arson must be reversed; and (4) whether defendant's conviction for arson must be vacated if this court affirms his conviction for aggravated arson, as the two offenses

are based on the same conduct.

It is only necessary to set forth the proceedings below relevant to the issues raised on appeal. Prior to trial, defendant requested and was granted a hearing to determine his fitness to stand trial pursuant to section 104—11 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1981, ch. 38, par. 104—11). Dr. Lyle Rossiter, a psychiatrist, called by the defendant, testified that defendant was not able to recount from his own recollection what had occurred on the day of the offenses, April 19, 1982, because defendant was suffering from psychogenic amnesia which, in his opinion, was not fabricated. It was his further opinion that the amnesia would hamper defendant's ability to confer with his counsel, defend himself, and receive a fair trial. However, Rossiter also testified that defendant was entirely lucid on what his lawyer was trying to do for him, understood the proceedings against him, and could effectively communicate with his counsel and make trial decisions, but could not assist in his defense during the amnesiac period. Defendant's amnesia could possibly be removed by clinical hypnosis or by administering sodium amytal. The only other witness to testify, a police officer who arrived at the shooting scene, stated defendant repeated the name "Tio" several times after being asked who he had shot. At that time, defendant was suffering from a self-inflicted gunshot wound.

The trial court, after concluding that there was no authority holding a defendant incompetent to stand trial solely on the basis of amnesia, found defendant fit to stand trial. The court below also rejected defendant's subsequent reassertions of this issue made during trial and after trial.

The relevant evidence adduced at the jury trial is summarized as follows.

Carpentersville police officer Marcia Davis testified that on April 19, 1982, she responded to a dispatch concerning a fire at defendant's residence located at 96 Wren Road, Carpentersville. When she arrived at the scene, she observed no signs of forced entry into the house. Two firefighters entered the residence and while they were inside, the house exploded. Davis noted that both firefighters sustained injuries as a result of the fire and were transported to a nearby hospital for treatment. Davis also related that several weeks earlier, on approximately March 8, 1982, she spoke to defendant concerning his fears that Raul Tio, his wife's boyfriend, was going to leave the State with his wife Kathy and their four children and that defendant appeared emotionally upset about this problem.

Carpentersville fire department captain Steve Zaccard testified

that he investigated the 96 Wren Road fire on April 19, 1982, to determine its origin and cause. Upon examining the premises, Zaccard found the stove pulled away from the wall in the kitchen, the flexible natural gas line disconnected, and a pair of vice grips on the floor. In another bedroom, he found a dead dog, which had apparently been shot and placed on a bunk bed. Zaccard noted that in his opinion, a fire was intentionally started in the rear master bedroom and had met with gas leaking from the kitchen gas line, which had been intentionally left open, resulting in the fire and explosion. Zaccard further stated that a volunteer fireman would be trained on the effect of natural gas on a house fire, that he knew defendant through defendant's participation as a volunteer fireman, and that he knew defendant to be an extremely family-oriented guy.

Marc's Big Boy Restaurant hostess Grace Gifford Turner and waitresses Patricia Walper and Linda Lipowski testified that sometime between 11 a.m. and noon, on April 19, 1982, a man carrying a shotgun, who they recognized as their co-worker Kathy's husband, defendant, and saw driving around the parking lot one hour earlier, enter the premises carrying a shotgun. Defendant told Turner not to move, and proceeded into the kitchen, where he fired two shots at Raul Tio, the store manager. Tio did not normally work that day, but was filling in for a cook. Defendant then walked out of the restaurant calmly and at a normal pace. After defendant left the premises, Tio was found dead on the kitchen floor. Their testimony also indicated that about a month earlier defendant came into the restaurant and asked who was the store manager, what he looked like, and where he lived, and also stated "that man ruined 10 years of my marriage."

Carpentersville police officer Robert Stakes testified that on April 19, 1982, between 11 and 11:30 a.m., he responded to a dispatch concerning a shooting at the Big Boy. Stakes searched the woods across the street from the restaurant and saw defendant, who he recognized from high school as Steve Schwartz, lying on the ground with a shotgun wound in his left chest. Stakes stated that he recovered several items from defendant's possession, including clothing, jewelry, photographs, defendant's marriage license, and a love letter written by defendant's wife to Raul Tio. The officer also related that he had a conversation with defendant several months earlier in which defendant appeared upset.

In addition to the above occurrence testimony, both sides presented substantial evidence concerning the events preceding the fire and shooting. Defendant's ex-wife, Kathy Schwartz, testified that she lived with defendant and their four children at the 96 Wren Road ad-

dress until March 6, 1982, when she and the children moved out, following an argument with defendant. During the argument, defendant held a knife to his chest and threatened to kill himself and Kathy. As a result, Kathy called the police. Kathy also related that after filing for a divorce from defendant, she occasionally drove by the 96 Wren Road residence, sometimes alone and sometimes accompanied by her four daughters and/or Raul Tio, and kept a diary on what she observed. Kathy first became acquainted with Raul Tio when he was hired as manager of the restaurant and they became very good friends; however, she denied having an affair with him. When confronted with several love letters to Tio, found in defendant's possession, Kathy admitted that she had written them.

Michelle Tio, the decedent's wife, testified that she first met defendant in March 1982, and spoke to him about Raul and Kathy. Defendant told her he did not want his wife to have anything, and that he was going to blow up his house so Raul and Kathy would get what they deserved. She also stated that defendant was very upset about the whole situation.

Thomas Whitaker, a close friend of defendant, testified that he talked to defendant on various occasions concerning his pending divorce and Kathy's affair with Raul. As the divorce drew near, defendant became more upset because of his fears about the future of his children. Approximately two weeks prior to April 19, 1982, defendant told Whitaker that things were looking good in court and that he might get custody of the children and the marital home, but that he was concerned about being a good father to his children. Whitaker related that while under the influence of alcohol, defendant said he thought about blowing up his house by natural gas explosion and moving to California with his dog. Whitaker also stated that at times defendant appeared irrational, confused and would vacillate between ideas.

Daniel Schwartz, defendant's brother, testified that after Kathy and the children moved out, he moved in with defendant because his brother appeared very nervous and upset. Daniel saw Kathy, Tio and the children drive by the defendant's house on several occasions, and defendant would get upset when this happened. Daniel also stated that defendant carried Kathy's letter to Tio with him at all times and would read it repeatedly every other night. After reading the letter, defendant would get sad and depressed, and was in tears on one occasion. Daniel last saw defendant at their mother's home the day before the incident, and defendant told him that Kathy would not let him have the kids for the day. At that time, defendant looked like he had

been crying and appeared very upset. Shortly thereafter, defendant got up and left after stating that he couldn't take it anymore.

Defendant's mother, Evelyn Schwartz, testified that defendant had borrowed her car to attend a custody hearing on the morning of April 19, 1982. After learning of the shooting, she accompanied the police to the Big Boy, where she found the car with the keys locked inside. Mrs. Schwartz stated she last saw her son at her home the day before the shooting. He looked tired and distraught, and kept saying, "I don't know how the court can take my four girls away from me." She noted that between March 5, 1982, and April 19, 1982, she saw her son change from his usual joking, helpful self, to a sad and depressed individual. Defendant told his mother he left his position at the fire department because the job required an alert mind and he feared that in his state he would be endangering the lives of others. When defendant spoke to her about Kathy's affair, he became very emotional because his home and family were most important to him. Mrs. Schwartz also stated that defendant said he had to have a job by the custody hearing on April 19 to win custody of the children and, if he did not, he feared Kathy and Raul would take his daughters and leave Illinois.

Defendant, Steven Schwartz, in addition to reiterating much of the above testimony, testified that on March 5, 1982, he met his wife for lunch and she told him that she wanted a divorce because she was seeing another man. He did not recall the incident with the knife on that evening, but remembered Kathy leaving with the children. Defendant said that during the period between March 5, and April 19, 1982, he became confused, angry, hurt and could no longer sleep, eat, or concentrate. He began using alcohol and cocaine, and repeatedly broke down and cried. Defendant was supposed to take his children to his mother's home on April 18, 1982, but his wife said that she and Tio had plans and he could not have them. Defendant also testified that he did not have a job by April 18 and thought he would lose custody of the children in court the following morning. When questioned about his recollection of the events leading up to and including the April 19, 1982, fire and shooting, defendant stated that all he could remember on April 18, 1982, was his brother Dan standing in the driveway and that he did not remember any events on April 19, 1982, but remembers waking up in the hospital during the following week.

Defendant then called three mental health experts in support of his insanity defense. Medical psychologist William Glen Fischer testified that on September 23, 1982, he gave defendant a series of psychological tests. The test results indicated that defendant had great

difficulty in forming and containing human relationships and in maintaining contact with reality. Fischer stated that in his opinion defendant suffered from a legitimate organic brain or personality syndrome which would render him unable to control his impulses for hours. In Fischer's opinion, defendant's syndrome was dormant, but was triggered by the stressful events of March and April 1982, including his wife's affair with Tio, his separation from his children, and his fear of losing them due to his failure to find employment.

Psychiatrist Dr. Lyle Rossiter testified that he examined defendant on July 10, 1982, at the State's request, and found that defendant suffered from psychogenic amnesia which was not feigned in any way. Based upon his examination of defendant, Dr. Rossiter stated that in his opinion, on April 19, 1982, defendant suffered from a unipolar depressive disorder, a mental disease or defect, that seriously impaired his ability to control his actions and conform his conduct to the requirements of the law.

Psychiatrist Dr. Albert Henry Stipes testified that he examined defendant on July 8, 1982, and that in his opinion defendant was suffering from a mental disease on April 19, 1982, which Stipes labelled a brief, reactive psychosis, triggered primarily by stress caused by defendant's fear of losing his children. As a result, the doctor noted that defendant's ability to conform his conduct to the requirements of the law had been substantially impaired.

The State then called two mental health experts in rebuttal. Dr. Werner Tuteur, a psychiatrist specializing in mental health disorders, testified that he examined defendant on October 11, 1982, and that in his opinion defendant did not suffer from any mental disease or defect on April 19, 1982. In support of his opinion, Dr. Tuteur noted that defendant's conduct was too perfectly coordinated and intentional for him to have been unable to conform his conduct to the requirements of the law and to appreciate its criminality. Dr. Tuteur further related that defendant's amnesia to the events of April 19, 1982, would not alter his opinion in any way because amnesia occurs after the fact and has no bearing on what defendant did when he did it. Dr. Tuteur admitted, however, that persons suffering from mental disease do have the ability to carry out intentional acts in certain circumstances.

Psychologist Ralph Mesenbrink said that he had administered tests to defendant in July 1982, but that he could not diagnose defendant from his test results because, in Mesenbrink's opinion, defendant had "faked bad" on the tests, rendering the results inconclusive.

■ Defendant first contends that the trial court erred when it

concluded, after a pretrial fitness hearing, that defendant's amnesia did not render him unfit to stand trial. He also claims that the trial court's denial of his post-trial motion, which asserted that the pretrial ruling should have been set aside, was error because his amnesia "precluded him from presenting the only possible evidence of his state of mind at the time of the fire." Essentially, defendant's latter argument is that his trial was rendered unfair because of his amnesia. He contends that the trial court, following the trial, should have re-evaluated whether defendant's amnesia did affect the fairness of the proceeding in accordance with the factors set forth in *Wilson v. United States* (D.C. Cir. 1968), 391 F.2d 460.

The State, in response, basically maintains that the evidence adduced at the fitness hearing showed that, even though suffering from amnesia, defendant was able both to understand the nature and purpose of the proceedings against him and to assist counsel in his defense. Thus, the State contends defendant was fit for the purpose of trial.

The issue of whether the amnesia of a defendant renders him unfit to stand trial or incapable of receiving a fair trial, while not previously addressed by any Illinois reviewing court, has been treated in a legal periodical frequently cited in decisions (Comment, *Amnesia: A Case Study in the Limits of Particular Justice*, 71 Yale L.J. 109 (1961)), and has been considered in other jurisdictions. (See generally Annot., 46 A.L.R.3d 544 (Supps. 1972 & 1984).) Defendant here does not argue for a rule that amnesia *per se* constitutes unfitness to stand trial, nor has any court having considered the issue so found. (See *Morrow v. State* (1982), 293 Md. 247, 443 A.2d 108.) Defendant advocates that a case-by-case approach be taken similar to that suggested in *Wilson v. United States* (D.C. Cir. 1968), 391 F.2d 460. (See also *Jackson v. State* (Tex. Crim. App. 1977), 548 S.W.2d 685.) In *Wilson*, the majority opinion held that while the trial court should decide the question of competency before trial, it should nevertheless also determine after the trial and before sentencing if, as a matter of fact, defendant's loss of memory deprived him of a fair trial and the effective assistance of counsel. The court recommended a post-trial hearing in which the trial court would consider certain listed factors as relevant to the affect of the amnesia on the fairness of the trial. Other decisions, however, have declined to follow a case-by-case analysis, and instead have held that amnesia, by itself, as to the events of the crime charged, does not justify a finding of unfitness to stand trial. *Morrow v. State* (1982), 293 Md. 247, 443 A.2d 108; *State v. Austad* (1982), 197 Mont. 70, 641 P.2d 1373; *People v. Stolze* (1980), 100 Mich.

App. 511, 299 N.W.2d 61; *Reagon v. State* (1969), 253 Ind. 143, 251 N.E.2d 829; see *United States v. Stevens* (7th Cir. 1972), 461 F.2d 317.

Our analysis must begin with this State's statute on fitness, which provides:

> "A defendant is presumed to be fit to stand trial or to plead, and be sentenced. A defendant is unfit if, because of his mental or physical condition, he is unable to understand the nature and purpose of the proceedings against him or to assist in his defense." (Ill. Rev. Stat. 1983, ch. 38, par. 104—10.)

The issue of defendant's fitness may be raised at any appropriate time before, during, or after trial. (Ill. Rev. Stat. 1983, ch. 38, par. 104—11.) A defendant is unfit to stand trial if, because of a mental or physical condition, he is unable: (1) to understand the nature and purpose of the proceedings against him; or (2) to assist in his defense. (*People v. Lang* (1979), 76 Ill. 2d 311, 322, 391 N.E.2d 350.) Fitness speaks only to a person's ability to function within the context of trial, and it does not refer to sanity or competence in other areas. (*People v. Murphy* (1978), 72 Ill. 2d 421, 432-33, 381 N.E.2d 677.) It is evident from a reading of our statute that it is concerned with an accused's "present" condition to understand the nature and purpose of the proceedings against him and to assist in his defense.

Under a fitness statute similar to this State's, the court in *Morrow v. State* (1982), 293 Md. 274, 443 A.2d 108, held that amnesia, by itself, did not amount to unfitness to stand trial. The court reasoned that "the understanding required is the nature of the charge, the facts required to be proved to sustain the charge, and the consequences attending a conviction for having committed the charge. Amnesia does not inhibit dialogue and discussion between attorney and client as to tactical decisions concerning the trial." 293 Md. 247, 255-56, 443 A.2d 108, 113.

In *Banks v. State* (1980), 246 Ga. 178, 269 S.E.2d 450, decided under a similar fitness statute and set of circumstances, the Supreme Court of Georgia stated that the relevant inquiry to be made is:

> "[W]hether or not the movant is incompetent to stand trial at the particular time of the trial of the special plea and not whether or not he has lack of memory relating to some prior specific event. If he understands the proceedings and can assist in his defense the special plea of insanity cannot be sustained. The question is not whether he will assist in his defense, but whether he is capable of doing so." 246 Ga. 178, 181, 269 S.E.2d 450, 453.

■ In the present case, the psychiatric evidence at the pretrial

fitness hearing was that although defendant was suffering from psychogenic amnesia as to what occurred on the day of the offenses with which he was charged, defendant was entirely lucid on what his lawyer was trying to do for him, understood the proceedings against him, and could effectively communicate with his lawyer and make trial decisions, except he could not cooperate in his defense concerning the amnesiac period. We believe from this evidence that defendant was able to understand the nature and purpose of the proceeding against him and to assist in his defense, as contemplated under our statute, and his inability to recollect the events on the day of the offenses due to his amnesia does not, by itself, warrant a contrary conclusion. The trial court under this evidence correctly found defendant fit to stand trial.

■ Defendant, immediately prior to trial and during trial, also made additional motions for the court to reconsider its ruling finding him fit for trial. No new evidence was offered or a hearing requested. The motions were denied. As nothing new was presented on this issue, the court correctly denied the motions to reconsider.

■ Finally, defendant stated in his post-trial motion that the court "erred and committed reversible error when it failed to set aside *** the previous ruling of the court that the defendant was fit to stand trial, and failed to order an immediate competency hearing, said previous rulings of the court being entered after hearing on November 10, 1982." Again, no new evidence was offered or a hearing requested. However, defendant now argues on appeal that his amnesia made it impossible for him to describe his state of mind at the time he set his house on fire to either his attorney or the jury. He argues that this impaired his ability to establish his insanity defense and deprived him of a fair trial.

While this precise argument was not made at the post-trial hearing and could be considered waived, we choose to consider the merits of the contention because it challenges the fairness of the proceedings against him under the unique circumstances here where defendant suffers from amnesia concerning the events for which he is charged. See *People v. Hoskins* (1984), 101 Ill. 2d 209, 219, 461 N.E.2d 941.

The issue is one of due process—the fairness of the trial. Thus, we must focus on whether defendant's amnesia as to the April 19, 1982, occurrences out of which the criminal charges arose deprived him of a fair trial under the particular facts of the instant case. Specifically, defendant maintains that his amnesia precluded him from presenting the only possible evidence of his state of mind at the time the acts leading to the charged offenses were committed, his own testimony.

The lack of his own state of mind testimony, defendant continues, substantially impaired his ability to effectively present his defense of insanity and therefore denied him a fair trial.

■ At the outset we note that while the constitution guarantees that a defendant receive a fair trial, it does not necessarily guarantee a defendant receive a perfect one. See *United States ex rel. Crist v. Lane* (7th Cir. 1984), 745 F.2d 476, 482; *Jackson v. State* (Tex. Crim. App. 1977), 548 S.W.2d 685.

■ Our review of the record in the instant case reveals that defendant's amnesia as to the April 19, 1982, events did not substantially impair his ability to effectively present his insanity defense. Defendant does not dispute the fact that he committed the charged offenses on April 19, 1982. Rather, the thrust of his argument on appeal focuses on the issue of his insanity at the time of his criminal conduct. As noted above, while defendant was afflicted with psychogenic amnesia as to the April 19, 1982, incidents, he was still able to effectively communicate with his attorney and provide him with all the factual information pertinent to the presentation of his insanity defense, except for his brief amnesiac period. Defendant also took the stand in his own defense and gave accurate and detailed testimony concerning the stressful events preceding his amnesiac period including his wife's affair with Raul Tio, his fears that he would lose custody of his children on April 19, due to his failure to obtain employment by that date, and his general emotional instability prior to April 19, 1982. Moreover, defendant presented testimony by various other witnesses corroborating these alleged stressful provocations which also supported his insanity defense. Finally, defendant was also able to present the jury with the testimony of three mental health experts, each essentially testifying that defendant was unable to conform his conduct to the requirements of the law on April 19, 1982, and that defendant's conduct on that date was the product of a mental disease or defect triggered by extreme stress. Under these particular circumstances, we find that defendant was able to fully develop and effectively present his insanity defense before the jury. Nothing in the record suggests that defendant's own testimony was necessary to bolster his already well-supported theory of defense. Accordingly, we conclude that the lack of his own testimony as to his state of mind on April 19, 1982, did not operate to deprive him of a fair trial.

■ Defendant next contends that the State did not prove him sane beyond a reasonable doubt at the time he set fire to his house and therefore, his convictions for arson and aggravated arson must be reversed. In support of his position, defendant notes that based upon

the evidence adduced at trial, it is illogical that he could have been found sane but mentally ill by the jury at the time he set fire to his home and yet insane at the time of the shooting, where only a short period of time, approximately 10 to 15 minutes, separated the two acts.

At trial, while there was no direct eye-witness account of defendant's setting of the fire and the resulting explosion, circumstantial evidence adduced by the State through the testimony of fire department captain Zaccard showed that the fire and explosion were deliberately planned and that defendant, through his participation as a volunteer fireman, would possess the specific knowledge of how to cause such an explosion. Other evidence introduced by the State through the testimony of several witnesses revealed that defendant had talked about setting fire to and blowing up his home prior to the actual April 19, 1982, incident. The State, in rebuttal, also introduced the testimony of two mental health experts. The first expert, Dr. Tuteur, told the jury that in his opinion defendant was sane during the entire course of the April 19, 1982, events, and that defendant's actions were planned and intentional and not a product of insanity. The State's other expert, Dr. Mesenbrink, stated that in his opinion, based upon the tests he performed, defendant had "faked bad," rendering him unable to accurately diagnose defendant's condition.

Defendant's evidence, introduced through the testimony of various witnesses, showed that during the period immediately preceding April 19, 1982, he had been subject to severe stress caused by the circumstances surrounding his wife's affair with another man, his pending divorce, and his fears that he would lose custody of his four children due to his failure to find employment. Defendant, in support of his insanity theory of defense, also introduced the testimony of three mental health experts, each essentially stating that defendant was suffering from a mental disease or defect triggered by stress which seriously impaired his ability to conform his conduct to the requirements of the law on April 19, 1982.

Once a defendant introduces sufficient evidence to create a reasonable doubt as to his sanity at the time of the offense, the State must then sustain the burden of proving the defendant guilty by establishing beyond a reasonable doubt that the defendant was sane at the time of the offense. (Ill. Rev. Stat. 1981, ch. 38, par. 6—2; *People v. Silagy* (1984), 101 Ill. 2d 147, 168-69, 461 N.E.2d 415; but see Public Act 83—288 (1983 Ill. Laws 2035-36), amending Ill. Rev. Stat. 1981, pars. 3—2, 6—2 (which, effective January 1, 1984, changes the burden of proof when the affirmative defense of insanity is raised).)

Whether the State carried its burden is a question of fact, and the jury's determination will not be reversed unless so improbable or unsatisfactory as to create a reasonable doubt as to the defendant's sanity. (*People v. Silagy* (1984), 101 Ill. 2d 147, 169, 461 N.E.2d 416.) The resolution of contradictory expert testimony and the determination of its weight and credibility are also matters within the discretion of the trier of fact. *People v. Alerte* (1983), 120 Ill. App. 3d 962, 968, 458 N.E.2d 1106; *People v. Teague* (1982), 108 Ill. App. 3d 891, 899, 439 N.E.2d 1066.

■ Our examination of the record reveals that the jury was presented with sufficient evidence from which it could conclude that defendant was sane at the time of the fire. While the three mental health experts called by defendant testified that defendant was not able to conform his conduct to the requirements of the law on April 19, 1982, Dr. Tuteur testified that defendant was sane on that date and that his conduct was planned and intentional. Additionally, another expert witness, Dr. Mesenbrink, stated that defendant had "faked bad" concerning the April 19, 1982, incidents rendering his test results inconclusive. The record also reveals that the fire had been intentionally started in defendant's residence and that defendant had previously informed several persons of his intent to blow up his home so his wife and her boyfriend "would get what they deserved." Viewing this evidence in light of the intervening 10- to 15-minute period between the setting of the fire and the shooting, we cannot say that the jury's determination was so improbable or unsatisfactory as to create a reasonable doubt of defendant's sanity.

■ Defendant has expressly stated in his brief and at oral argument that he does not contend that the convictions for aggravated arson and arson must be reversed as legally inconsistent with the verdict on the murder offense. Therefore, we need not address any issue in this regard except to observe that not only do both arson offenses with which defendant was charged consist of different elements from the murder, but also the offense of murder and both arson offenses are separate in time and in location. Thus, the seemingly inconsistent jury verdicts as to defendant's sanity at the time of the subsequent murder and the earlier setting of the fire may be explained, on examination of the entire record, by the closely related, but different set of facts relevant to each offense, or perhaps simply by the jury's expression of lenity. (See *People v. Barnard* (1984), 104 Ill. 2d 218, 227, 470 N.E.2d 1005.) Logically inconsistent verdicts can stand. See *People v. Frias* (1983), 99 Ill. 2d 193, 197, 457 N.E.2d 1233.

For the foregoing reasons, reversal of the aggravated arson and

arson verdicts are not required on this basis.

However, the defendant's conviction for aggravated arson, as charged under section 20—1.1(a)(3) of the Criminal Code of 1961 (Ill. Rev. Stat. 1981, ch. 38, par. 20—1.1(a)(3)), must be reversed under the recent holding of our supreme court in *People v. Wick* (1985), 107 Ill. 2d 62, which rendered unconstitutional subsection (a)(3) of the aggravated arson statute. The judgment and sentence for arson remain.

The conviction for aggravated arson is reversed, and the judgment and sentence for arson are affirmed.

Affirmed in part, and reversed in part.

NASH, P.J., and STROUSE, J., concur.