THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
DAVID BLAIR, Defendant-Appellant.

First District (3rd Division)   No. 82—1248

Opinion filed July 16, 1986.

Steven Clark and Karen Michels, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, Jane E. Liechty, and Robert W. Bertucci, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE RIZZI delivered the opinion of the court:

Following a bench trial, defendant, David Blair, was found guilty of aggravated battery and sentenced to 42 months in prison. On appeal defendant argues that his conviction should be reversed and he should be given a new trial because (1) the trial court should not have found the victim competent to testify, (2) his motion to suppress the victim's pretrial photographic identification should have been granted because the identification was the product of a suggestive procedure, and (3) the victim's in-court identification should not have been allowed because it was the product of the suggestive identification procedure and was unsupported by an independent basis. We affirm.

At trial, the victim, Juan Saenz, testified that on May 17, 1980, around 4:45 a.m., as it was getting light, his friend, Lucas Jurado, arrived in his camper-type truck to take the witness to work. Jurado pulled into the alley behind Saenz' home, and he let Saenz into the

back of the truck. Shortly thereafter, Saenz saw one of the windows on the truck break. Although he saw a stick, he did not see who broke the window. Saenz stated that he then saw defendant as defendant walked by a side window towards the back of the truck. At this point, Saenz identified defendant in open court.

Saenz further testified that defendant came to the back of the truck and broke one of the windows to the door of the truck. Fearing that his own car would be damaged, Saenz exited the truck. There, he saw defendant holding a raised stick. Jurado was holding a garbage can lid over his head for protection. After looking at defendant, Saenz ran down a gangway to Wallace Street, where two of three men standing in a doorway grabbed him and held him captive. Saenz then observed defendant coming down 28th Street. Defendant turned onto Wallace, and he looked at Saenz. The witness then observed defendant run in his direction, keeping to the far side of cars parked on the street. Defendant then came up close behind the witness, who, despite being restrained, was able to turn a little and see defendant. The last thing Saenz remembered was being struck on the head with a stick wielded by defendant.

Lucas Jurado's testimony corroborated most of the testimony given by Saenz. Jurado testified that after admitting Saenz to the back of the truck on May 17, 1980, he was returning to the driver's seat when defendant pulled into the alley. Jurado watched defendant walk towards him. Defendant said something in English, to which Jurado responded that he did not speak English. Defendant then struck at him with a stick. Jurado grabbed a lid to a garbage can to ward off the blows. Defendant then broke two of the windows in his truck. Saenz got out of the truck as soon as the back window was broken and ran through the gangway. Defendant ran out to the street.

Jurado further testified that after ascertaining that his other passengers had not been injured, he ran through the gangway. Upon exiting, he saw Saenz lying on the ground. Defendant and three other men were standing around him. Defendant had a stick in his hand. Jurado watched as defendant and the other three men ran to their cars and departed.

Jurado also gave testimony concerning an incident which occurred on May 31, 1980, which resulted in defendant's arrest. In cooperation with a police department effort to find the people responsible for Saenz' beating, Jurado agreed to help recreate the circumstances under which the beating occurred. This undercover operation was conceived and executed by Officer Castenada, who was assigned to the

human relations unit of the Chicago police department. This department is responsible for follow-up investigations of incidents that may have racial, religious or nationalistic overtones. Saenz and Jurado are Mexican by birth, and their attackers were Caucasians.

On May 31, 1980, Jurado, with Castenada and another police officer posing as passengers, drove his truck to the alley behind Saenz' home just as he had done on May 17. When nothing occurred, Jurado drove to the corner of 31st Street and Wallace. There, Jurado and the officers alighted. While they were standing on the sidewalk, a car pulled up. The car went in reverse a little and then came up on the sidewalk towards Jurado and the officers, who jumped behind a post. The officers yelled and drew their weapons and ordered the occupants out of the car. Defendant was one of the occupants, and when Jurado saw him, he identified defendant as the man who had attacked him in the alley and who had been standing with a stick near Saenz.

Defendant first argues that the trial court abused its discretion in finding Saenz competent to testify at trial. Defendant points out that in May 1981, the court found on two occasions that Saenz was incompetent to testify because he could not articulate the difference between a lie and the truth or the meaning of an oath. According to defendant, Saenz remained unable to appreciate the moral duty to tell the truth at the time of trial, and Saenz' testimony demonstrated that he had been coached in this regard. Moreover, defendant argues, the hearing regarding Saenz' competency at the time of trial was inadequate because Saenz' ability to recollect was not established. We reject these arguments.

The record shows that when Saenz left the hospital after spending two months there following the beating, his mental faculties were severely impaired. He was not even able to recognize his wife. Castenada testified that to his knowledge, Saenz had never been shown photographs of possible suspects prior to April 1981, because his "condition was one that he was not remembering."

In April 1981, however, Saenz' wife contacted Castenada and told him that while she and her husband were driving in the vicinity of their home, her husband recognized one of the offenders. Four days later, Castenada, his partner, and an assistant State's Attorney went to Saenz' home to show him photographs. Castenada acted as interpreter for Saenz. When Saenz viewed the four photographs set before him, he identified defendant as the person who struck him on the head with a stick.

Defendant filed a motion to suppress the photographic identification. Saenz was called to testify in regard to the motion on May 26,

1981. When defense counsel began questioning Saenz it became apparent that Saenz was having difficulty understanding questions and responding to them. Although Saenz testified that he remembered what occurred on May 17, 1980, and gave accurate information regarding the time he spent in the hospital, Saenz exhibited confusion when defense counsel started to question him regarding the oath that had been administered to him. Thereafter, the court, defense counsel and one of the prosecutors questioned Saenz regarding the oath and his understanding of the difference between the truth and a lie. Among the questions asked and the responses given were the following:

"THE COURT: Do you know the reason I asked you to raise your right hand?

MR. SAENZ: As soon as you asked me, to raise my hand, I didn't know why.

* * *

THE COURT: Do you know what an oath is?

MR. SAENZ: Look, I don't understand what you are saying.

* * *

MR. RILEY [Defense Counsel]: Tell me, in your own words, what an oath is.

MR. SAENZ: Today I came to court because the people, they hit me, were to be here today.

* * *

THE COURT: [What does it mean] to tell the truth?

MR. SAENZ: I am going to tell you the truth. I lost my memory. That is one of the reasons why I can't explain it to you.

* * *

MR. SZIGETVARI [assistant State's Attorney]: Mr. Saenz, what does God do to those who lie?

MR. SAENZ: Look, whenever you want me to tell you something, answer you something, I can't.''

When this questioning concluded, the court commented that while it did not believe that it had initially been defense counsel's intention to disqualify Saenz, it was apparent that the witness had difficulty in understanding the questions and communicating. The court determined that the witness was not competent to testify on that day. However, the court agreed to allow the witness to be examined the next day with the use of an interpreter the State had previously used with this witness.

The next day, the interpreter proposed by the State as well as the

interpreter used the day before were both sworn. The court and the prosecutor asked Saenz questions similar to those asked on the preceding day, and Saenz' answers were equally unresponsive. The court again found the witness incompetent. In making this determination, the court stated, "Now the basis for my finding the [victim] incompetent, so the record is clear, is not his inability to recollect what may have transpired regarding this transaction or alleged transaction with the defendant, but deals with his general competence as a witness." The court further stated that it had not been presented with any evidence as to when, if ever, Saenz would be competent to testify. However, the court took note of the fact that the State was surprised by the witness' incompetence, and the court continued the date for trial to July 13, 1981.

The trial here did not commence until December 9, 1981. Saenz was the first witness called by the State. The prosecutor asked the witness certain preliminary questions about his background, his employment and his family. Saenz responded clearly and appropriately to these questions. The prosecutor then inquired as to Saenz' understanding of the difference between the truth and a lie. When the witness was asked whether he could give an example about someone in the courtroom that was not true, the witness replied in an unresponsive manner. Thereafter, however, when the prosecutor asked Saenz questions regarding physical facts, Saenz responded correctly as to whether such facts were the truth or a lie. In regard to the oath he had taken, Saenz was asked the following questions and gave the following responses:

"MR. GOLDSTEIN [assistant State's Attorney]: When you took the oath to swear to tell the truth, what did that mean to you?

MR. SAENZ: To promise to tell the truth.

MR. GOLDSTEIN: Are you going to tell the truth today?

MR. SAENZ: Yes.

MR. GOLDSTEIN: Are you going to answer truthfully any questions that are put to you by either attorney?

MR. SAENZ: Yes."

The following questions and answers occurred during cross-examination.

"MR. RILEY [defense counsel]: Mr. Saenz, what is an oath?

MR. SAENZ: Well, to promise to tell the truth.

MR. RILEY: Okay, what is the truth?

MR. SAENZ: If I say a lie, I can be punished.

MR. RILEY: Punished by whom?

MR. SAENZ: The Judge, the one who rules."

At the conclusion of the questioning relating to Saenz' competency, the court made the following observations in finding the witness competent to testify:

"I do have an independent recollection of this witness testifying. I think his appearance and demeanor on the witness stand today is far different from the way it was on [May] 26th.

Notwithstanding the language difficulty, I think he has responded relevantly to all the questions asked, and appears to be well-oriented in terms of time and place and events; comprehends his responsibility as a person under oath.

Consequently, I do find him competent to testify at this time."

The test of the competency of a witness is one of intelligence and understanding. In the absence of statute, a person mentally impaired is not incompetent if he understands the nature of an oath and has sufficient mental power to give a correct account of what he has seen and heard. (*People v. Dixon* (1961), 22 Ill. 2d 513, 515, 177 N.E.2d 224, 225.) The competency of a person to testify as a witness is determined as of the time the witness is offered and not at the time when the facts testified to occurred. (*Knab v. Alden's Irving Park, Inc.* (1964), 49 Ill. App. 2d 371, 385, 199 N.E.2d 815, 823.) Here, the record establishes that Saenz was competent to testify at trial. The testimony which we have set forth demonstrates a marked difference in the way Saenz responded to questions in May, when he was found incompetent, and the way he responded in December, when he was found competent. At the latter, critical time, Saenz gave clear, coherent answers to questions regarding the meaning of an oath, and he was able to demonstrate that he knew the difference between lying and telling the truth. The record does not support defendant's assertion that Saenz' answers were the result of "coaching." Saenz responded appropriately to questions asked by defense counsel as well as those posed by the State. While Saenz' answers were stated in simple terms, we must bear in mind that the purpose behind the questions posed was not to establish the witness' metaphysical concept of an oath but rather to demonstrate that the witness was able to understand the moral duty to tell the truth. Saenz was able to define the word "oath," and he also recognized that he could be punished by the judge if he failed to testify truthfully. The trial court stated that the witness' appearance and demeanor were far different than they had been six months before, and it specifically found that the witness comprehended his responsibility as a person under oath. We see no reason

to disturb the court's decision.

■■ We also reject defendant's argument that Saenz should not have been found competent because his ability to recollect was not established. Initially, we point out that defendant failed to ask any questions in this regard when questioning Saenz about his competency. Moreover, the determination of a witness' competency may be arrived at by observing the witness' demeanor and ability to testify during trial, and such a determination is within the sound discretion of the trial court. (*People v. Spencer* (1983), 119 Ill. App. 3d 971, 976, 457 N.E.2d 473, 477.) Here, Saenz clearly demonstrated his ability to observe, recollect and communicate by the testimony he gave at trial. His account of the events surrounding the beating was intelligible, and it was not shaken by defense counsel's searching cross-examination. Any difficulty which Saenz had in responding to questions and any inconsistencies in his answers merely affected his credibility and the weight to be accorded his answers. (See *People v. Scott* (1982), 108 Ill. App. 3d 607, 610, 439 N.E.2d 130, 133.) We conclude that the trial court did not abuse its discretion in finding Saenz competent to testify.

■ Defendant next argues that he was denied due process of law by the admission into evidence of Saenz' pretrial photographic identification and Saenz' in-court identification because the photographic identification was the product of suggestive procedures and the in-court identification was unsupported by an independent basis. In support of his argument, defendant initially contends that the photographic-identification procedure was impermissibly suggestive because the police officers and the assistant State's Attorney failed to first test Saenz' ability to recall, or seek out medical reports regarding Saenz, even though they knew Saenz had been suffering from amnesia. According to defendant, since Saenz was declared incompetent to testify shortly after the photographic identification took place, there is a "logical inference" that he was also incompetent at the time he made the identification. We disagree.

The record shows that no attempt was made to have Saenz participate in a photographic identification procedure until Mrs. Saenz contacted the police and told an officer that her husband had recognized one of his attackers. Thus, Saenz was not presented with a photographic array until he indicated that he had recovered to the extent that he was capable of making an identification. Moreover, the assistant State's Attorney testified that he had initially interviewed Saenz to determine whether he could be a witness, and only after he talked to Saenz and decided that Saenz would be capable of testifying did he

show Saenz the photographs. Although Saenz was subsequently found not competent to testify, the court stated that the State was genuinely surprised by this finding. More importantly, the court declared that the finding of incompetency was not based upon Sanez' inability to recall the incident, but rather, his inability to comprehend the meaning of an oath. As for defendant's contention that the police officers and the assistant State's Attorney should have consulted medical reports, defendant has not presented us with any authority to support his position, and we do not believe that such inquiry was mandated here.

■ Defendant further argues that the identification procedure was unduly suggestive because Saenz testified that when he was shown the four photographs, he was asked, "Tell me which or all of those," indicating that the offender was one or all of the individuals portrayed. The error was compounded, according to defendant, because his picture was displayed along with the pictures of the other three occupants of the car involved in the May 31, 1980, incident. However, the police officers and the assistant State's Attorney testified that the question asked of Saenz was posed in a different manner. According to them, Saenz was only asked whether he recognized anyone in the pictures. Even if the question was phrased in the manner testified to by Saenz, though, we do not believe that it vitiated the identification. The police officers, the assistant State's Attorney and Saenz all testified that Saenz immediately identified defendant. Further, defendant has failed to explain how the use of photographs of defendant's companions was unduly suggestive. Defendant has not included the photographs in the record on appeal, and in the absence of any evidence to the contrary, we defer to the trial court's determination that the pictures were a fair array.

In any event, to the extent that there may have been suggestive aspects to the photographic identification, we do not believe that they resulted in a denial of defendant's right to due process of law. In *Stovall v. Denno* (1967), 388 U.S. 293, 18 L. Ed. 2d 1199, 87 S. Ct. 1967, the Supreme Court recognized that a defendant could claim that a confrontation conducted was so unnecessarily suggestive and conducive to irreparable mistaken identification that he was denied due process of law. This determination was to be based on the totality of the circumstances. (388 U.S. 293, 301-02, 18 L. Ed. 2d 1199, 1206, 87 S. Ct. 1967, 1972.) The next term, in *Simmons v. United States* (1968), 390 U.S. 377, 19 L. Ed. 2d 1247, 88 S. Ct. 967, the Supreme Court addressed the admissibility of an in-court identification in the wake of a suggestive out-of-court identification. The *Simmons* court recog-

nized the hazards attendant to initial identifications by photograph, yet concluded that such procedures were an effective component of law enforcement and should not be prohibited as a matter of constitutional requirement. The court went on to hold, consistent with *Stovall*, that "each case must be considered on its own facts, and that convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." 390 U.S. 377, 384, 19 L. Ed. 2d 1247, 1253, 88 S. Ct. 967, 971.

Subsequently, in *Neil v. Biggers* (1972), 409 U.S. 188, 34 L. Ed. 2d 401, 93 S. Ct. 375, the court stated that the standard set forth in *Simmons* serves equally well, with the deletion of "irreparable," as a standard for the admissibility of testimony concerning the out-of-court identification itself. (409 U.S. 188, 198, 34 L. Ed. 2d 401, 410, 93 S. Ct. 375, 381.) The court listed factors to be considered in determining the likelihood of misidentification, including the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the accused, the level of certainty demonstrated at the confrontation, and the length of time between the crime and the confrontation. (409 U.S. 188, 199-200, 34 L. Ed. 2d 401, 411, 93 S. Ct. 375, 382.) These factors were held to be applicable to post-*Stovall* as well as pre-*Stovall* cases in *Manson v. Brathwaite* (1977), 432 U.S. 98, 53 L. Ed. 2d 140, 97 S. Ct. 2243.

Applying these standards to the circumstances before us, we believe that the photographic identification was sufficiently reliable so that the trial court did not err in considering the testimony concerning that identification. In regard to Saenz' ability to view defendant at the time of the crime, Saenz testified that it was getting light at the time the incident occurred. He first observed defendant through a window in Jurado's truck after hearing another window break. When he exited the truck, he saw defendant facing him approximately a foot away. After Saenz was restrained by two men following his emergence from the gangway, his attention was again drawn to defendant as defendant came up 28th Street and turned onto Wallace and came towards him. Finally, Saenz was able to view defendant as he came to within a foot behind Saenz with his stick raised. Thus, Saenz had several opportunities to view his assailant. Although the observations were brief, it is clear that in each instance Saenz had reason to focus his attention on defendant.

Moreover, Saenz exhibited a high degree of certainty when he identified defendant's photograph. Upon viewing the photographs, Saenz tapped defendant's picture and identified him as the man with the stick. Although this identification did not take place until almost a year after the occurrence, the delay was due to the severe injuries the victim suffered in the incident. Saenz was not presented with the photographic array, however, until he indicated that he was able to recognize his attackers. Finally, defendant's cross-examination of the State's witnesses failed to expose any potential for error in the photographic identification procedure. See *People v. Brown* (1972), 52 Ill. 2d 94, 100, 285 N.E.2d 1, 5.

For all these reasons, we conclude that under the totality of the circumstances, the photographic-identification procedure was not so impermissibly suggestive as to give rise to a very substantial likelihood of misidentification. Therefore, the trial court did not err in denying defendant's motion to suppress the photographic identification. In view of our decision, defendant's argument that Saenz should not have been permitted to make an in-court identification must fail.

Accordingly, the judgment of the trial court is affirmed.

Affirmed.

McNAMARA and WHITE, JJ., concur.