THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JAMES C. SCHWAB, Defendant-Appellant.

Second District   No. 2—85—0136

Opinion filed December 31, 1986.

Dennis M. Tobin and Jayne Carr Thompson, both of Chicago, for appellant.

Philip L. DiMarzio, State's Attorney, of Sycamore (Kenneth R. Boyle and Virginia M. Ashley, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE LINDBERG delivered the opinion of the court:

Defendant, James C. Schwab, was convicted in the circuit court of De Kalb County of murder (Ill. Rev. Stat. 1983, ch. 38, par. 9—1) at the conclusion of a bench trial. He was sentenced to a term of 22 years' imprisonment.

On appeal, defendant raises two issues: (1) whether the trial court erred when it failed to raise *sua sponte* the issue of defendant's fitness to stand trial in violation of section 104—11(a) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1983, ch. 38, par. 104—11(a)) thus depriving defendant of his sixth amendment right to counsel; and (2) whether the trial court erred in failing to order a competency examination before allowing defendant's mother, the only occurrence witness beside the defendant, to testify where it was known that she had suffered three strokes between the time of the occurrence and the time of trial.

Defendant testified in detail about the day and evening of the shooting, May 25, 1984. He stated that he arose at 8:30 a.m. and prepared and administered his mother's morning injection. He left the house at noon or 12:30 p.m. to go to the Scalawag Restaurant where he had three or four whiskey manhattans and lunch, returning home at 2:15 p.m. He took his mother shopping at the Eagle Food Store. He went to the Illinois Job Service to see about temporary employment, and he took a copy of his resume with him. He thereafter retrieved his mother at Eagle, but before doing so, he had his brakes checked at Midas Muffler. He then took his mother home.

When he arrived at home he met his sister, Georgianna Fredrick, also known as Jigger. He testified in detail about his conversation with Jigger. It related to the preparation of the family's possessions for dispersal and the readying of the house for sale. Defendant lived with his mother, but his mother had decided to move to a nursing home, necessitating the breaking up of the family residence.

At about 5:15 p.m. defendant again left the house for the Coach Room Bar and had three or four whiskey manhattans. After 1½ to 2 hours, he drove to El Matador where he had perhaps four more manhattans and something to eat. It was the regular fish fry night. He had to order before they closed at 10 p.m. He then returned to his mother's house.

He testified that he drove from El Matador to his mother's house

and parked the car in the garage. He testified that he traversed the driveway to the public sidewalk and then walked up to the private entrance, the front door. Upon entering, he saw his mother and Jigger. His mother was preparing vegetables. Jigger, he testified, was moving back and forth between the living room and the kitchen. He then described in detail the manner in which Jigger was cleaning the glass of an empty curio cabinet. He testified as to the placement of items of furniture in the house and where the principals were in relation to the furniture. His mother and Jigger appeared angry at him and irritated with him.

He recalled asking Jigger if he could help and she answered negatively. She sat cross-legged on the floor to polish the glass shelves. He asked where her son Blair was. She retorted "He's my kid, you are an alcoholic, you cannot take care of your own kids." His mother was also in the room.

He testified that he then walked over to Jigger to try to tease her; he nudged her buttocks with his toe. She did not respond. The record then discloses the following colloquy:

"Q. And what actually did she do?

A. She backhanded me. I was struck in the area of the upper thigh and groin. I retorted her [sic] by slapping her in the face.

Q. Were you injured by this?

A. No.

Q. After you had struck her, what did you do?

A. We—This happened so quickly, and those are my last recollections prior to—to the incident with the gun in which I shot her.

Q. Do you recall going up the stairs?

A. I do not.

Q. Do you recall getting a gun?

A. No.

Q. Then the next thing you recall, you say, is the actual shooting?

A. The actual shooting of her.

Q. Would you tell us what you recall about the shooting?

A. I remember I had the gun in my hand, and I pulled the trigger twice.

Q. Do you remember where she was?

A. She was at the front door at the time.

Q. Now, after you had pulled the trigger twice, what do you recall?

A. I recall that she fell very slowly in front of me and then fell to the side. But she then—Her body then rotated slightly. She fell on her back in the area between the arc of the open front door and the right end of the desk; that is the end of the desk that would point towards south.

Q. Now, where was your mother at this time?

A. She had been seated all this while in her chair, except at the time of the shooting in which she jumped up from her chair and approached us in, obviously and understandably, despair and crying out to stop, something to that effect.

Q. When Jigger then fell to the floor, then what happened?

A. I remember just in my own mind of the disbelief, the despair that I felt. And I looked at my mother, and I think I probably reached out and touched her. I am not sure about that, but then she had—It seems to me that she had turned around to go back to her chair. And the next thing I recall accurately is making a telephone from the upstairs.

Q. Now—

A. And I recall that because I had to look for the number for whom to call. As is the practice so frequently nowadays, people send out little things that you can stick on your telephone receiver, you know, for emergency numbers. I did look at that, although I don't remember whether I called the police or the fire department.

Q. And what phone were you looking at and calling on?

A. This would be the pink cradle type telephone in the master bedroom which was then in those most [sic] following my father's death occupied solely by my mother."

Defendant argues that his defense was based upon establishing that the most serious crime of which he could be convicted was voluntary manslaughter. (Ill. Rev. Stat. 1983, ch. 38, par. 9—2). Since he could not convey to his attorney his feelings between the time of his argument with Jigger and his shooting of her, he was therefore unable to establish the effect her provocation had upon his mental state. This resulted in his inability to prove that the shooting was the product of an irresistible, sudden, and violent impulse of passion. See *People v. Hunter* (1937), 365 Ill. 618, 7 N.E.2d 444.

Defendant acknowledges that the question of whether a *bona fide* doubt of defendant's fitness to stand trial has been raised rests largely in the discretion of the trial court. However, defendant argues that to fail to order a fitness hearing *sua sponte* upon the failure of defense counsel to do so constituted an abuse of discretion. Defendant

asserts that the evidence of his preshooting amnesia was established by the defense psychiatric expert and was determined to be genuine and was unchallenged by the State. Defendant concludes that the trial court's failure to order a fitness hearing *sua sponte* violated section 104—11(a) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1983, ch. 38, par. 104—11(a)), denied defendant due process rights guaranteed him by the fourteenth amendment and his right to the assistance of counsel guaranteed by the sixth amendment to the constitution.

Sections 104—10 and 104—11(a) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1983, ch. 38, pars. 104—10, 104—11(a)) provide respectively:

"A defendant is presumed to be fit to stand trial or to plead, and be sentenced. A defendant is unfit if, because of his mental or physical condition, he is unable to understand the nature and purpose of the proceedings against him or to assist in his defense";

and:

"The issue of defendant's fitness for trial, to plead, or to be sentenced, may be raised by the defense, the State or the Court at any appropriate time before a plea is entered or before, during, or after trial. When a bona fide doubt of the defendant's fitness is raised, the court shall order a determination of the issue before proceeding further."

Where evidence raises a *bona fide* doubt as to a defendant's competence to stand trial, the judge on his own motion must impanel a jury and conduct a sanity hearing pursuant to section 104—11(a). Illinois jealously guards a defendant's right to a fair trial. *Pate v. Robinson* (1966), 383 U.S. 375, 385-86, 15 L. Ed 2d 815, 822, 86 S. Ct. 836, 842.

■ It has long been accepted that a person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in the preparing of his defense may not be subjected to trial. (*Drope v. Missouri* (1975), 420 U.S. 162, 171-72, 43 L. Ed. 2d 103, 112-13, 95 S. Ct. 896, 903-04.) The prohibition is fundamental to an adversary system of justice. (420 U.S. 162, 171, 43 L. Ed. 2d 103, 113, 95 S. Ct. 896, 904.) "There are, of course, no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed; the question is often a difficult one in which a wide range of manifestations and subtle nuances are implicated. That they are difficult to evaluate is suggested by the varying opin-

ions trained psychiatrists can entertain on the same facts." 420 U.S. 162, 180, 43 L. Ed. 2d 103,118, 95 S. Ct. 896, 908.

■ A defendant's statements alone that he is suffering from amnesia and cannot recall anything about the alleged offense and the statement of defense counsel that defendant is unable to give any assistance in the preparation of his defense is insufficient to require the trial court to order a sanity hearing. (*People v. Pridgen* (1967), 37 Ill. 2d 295, 298-99, 226 N.E.2d 598, 600-01; *People v. Bradford* (1979), 71 Ill. App. 3d 731, 736-37, 389 N.E. 2d 636.) The facts that a defendant spent time in a mental institution, had escaped from a mental institution within two months of trial, had attempted suicide, and had no recollection of the charges against him were insufficient to raise a *bona fide* doubt of his sanity where the trial court had observed the pretrial proceedings and the defendant's conduct demonstrated his understanding of the various aspects of the proceedings. (*People v. Richardson* (1978), 61 Ill. App. 3d 718, 726, 377 N.E.2d 1235.) The court in Richardson noted that the trial court had carefully observed the defendant throughout the hearings and trial and arrived at an informed and reasonable opinion on the issues of defendant's ability to understand the proceedings and to assist in his defense. 61 Ill. App. 3d 718, 727, 377 N.E.2d 1235.

■ The court found in *People v. Long* (1975), 30 Ill. App. 3d 815, 817-18, 333 N.E.2d 534, 537, that a defendant suffering from chronic alcoholism, alcoholic amnesia, passive aggressive personality, loss of reality and control upon excessive drinking, headaches due to cerebral concussion and anxiety and depression suggesting a suicidal risk was not entitled to an order of the trial court *sua sponte* for a competency hearing where a psychiatrist testified that defendant nonetheless understood the charges against him and cooperated with counsel. (30 Ill. App. 3d 815, 817-18, 333 N.E.2d 534, 537.) It is clear that the trial court is not obliged as a matter of law to accept psychiatric opinion. (*People v. Deizman* (1976), 44 Ill. App. 3d 829, 834, 358 N.E.2d 1208.) However, where the only evidence adduced at a fitness hearing was that the defendant was unfit to stand trial, the court was not free to ignore it. *People v. Williams* (1980), 87 Ill. App. 3d 860, 864, 409 N.E.2d 439.

In *People v. Schwartz* (1985), 135 Ill. App. 3d 629, 482 N.E.2d 104, we observed that the evidence at the pretrial fitness hearing was that although the defendant was suffering from psychogenic amnesia as to what occurred on the day of the offenses with which he was charged, the defendant was entirely lucid on what his lawyer was trying to do for him, he understood the proceedings against him, and he

could effectively communicate with his lawyer and make trial decisions, except that he could not cooperate in his defense concerning the amnesic period. We concluded that the defendant was able to understand the nature and purpose of the proceedings against him and to assist in his defense as contemplated under our statute (Ill. Rev. Stat. 1983, ch. 38, par. 104—11(a)), and his inability to recollect the events of the day of the offenses due to his amnesia did not, by itself, warrant a contrary conclusion. The trial court, we held, correctly found the defendant fit to stand trial. *People v. Schwartz* (1985), 135 Ill. App. 3d 629, 639, 482 N.E.2d 104.

In *Schwartz*, the defendant challenged the fairness of the proceedings under the unique circumstances of a defendant suffering from amnesia concerning the events for which he was charged. The question in *Schwartz* was whether the trial court erred in finding the defendant fit to stand trial after a fitness hearing. The question here, however, is whether the trial court erred in failing to order a fitness hearing *sua sponte*. We conclude that the instant case is indistinguishable from *Schwartz* and that *Schwartz* controls the disposition of the case at bar.

It does not appear that anyone, the trial court, the psychiatrist, or the defense counsel observed anything that gave rise to a *bona fide* doubt of defendant's ability to assist in establishing his theory of defense—voluntary manslaughter by reason of passion and sudden impulse resulting from provocation. That defendant suffered from amnesia for two or three minutes before he shot Jigger two times was not contested. It appears that no one observed any impediment to defendant's assistance to his own counsel. Nor does the record disclose that Dr. Rossiter testified, as he did in *People v. Schwartz* (1985), 135 Ill. App. 3d 629, 632, 482 N.E.2d 104, that defendant's amnesia would render him unfit by his inability to assist in his defense. The trial court was able to observe, as disclosed by the record, that defendant's able counsel elicited from defendant, in intricate detail and depth, the history of his relationship to his sister Jigger from the time of her birth when he was 12, until a period within two or three minutes of her death. Defendant was able to describe the events of the day and the activities leading up to the shooting. He described his shooting of the victim twice and the victim's reaction to his shooting as well as the subsequent events, except as to how the gun found its way between some towels on a table on the second floor. Defendant's testimony was lucid and very precise throughout in spite of the amnesic period of two to three minutes immediately preceding the shooting.

The person most likely to be aware of the inability of defendant to

adequately assist in the presentation of his defense would be defense counsel. Yet, counsel never complained of any difficulty (see *People v. Jones* (1974), 24 Ill. App. 3d 1052, 1054, 322 N.E.2d 579) in this regard even though Dr. Rossiter testified that he could not arrive at a determination of defendant's sanity at the time of the offense because of the amnesia. Yet, the trial court was not made aware by counsel of any lack of ability of defendant to aid in his defense. See *People v. Cohn* (1980), 91 Ill. App. 3d 209, 215, 414 N.E.2d 543.

We note that there was extensive testimony by Dr. Rossiter and defendant establishing defendant's theory that the shootings were the product of sudden impulse and passion resulting from Jigger's provocation. The trial court was able to hear some contradiction from defendant's and Jigger's mother, who declined to label the conduct of her children that evening as an argument. In any event, there was ample evidence adduced by defendant and the psychiatrist and other family members to establish defendant's theory of voluntary manslaughter so that defendant was not deprived of his sixth and fourteenth amendments rights to the assistance of counsel and due process respectively. *People v. Schwartz* (1985), 135 Ill. App. 3d 629, 482 N.E.2d 104.

Further it is apparent from Dr. Rossiter's testimony that he was able to arrive at a conclusion that defendant's acts were a result of Jigger's provocation. Although the amnesia inhibited Dr. Rossiter's ability to assess defendant's sanity at the time of the offense, there was obviously adequate evidence as testified to by Dr. Rossiter to permit Dr. Rossiter to infer that defendant's mental state was the result of Jigger's provocation of defendant. It appears to us that if there was sufficient evidence in the record for Dr. Rossiter's opinion evidence on defendant's mental state prior to the shooting, there was sufficient evidence for the trial court to also make the same inference if it had chosen to do so.

Defendant relies on the decision of the supreme court in *People v. Stanhope* (1969), 44 Ill. 2d 173, 254 N.E.2d 512, where a psychiatrist who had examined the defendant observed the defendant during his testimony in the second week of trial—some six months after he allegedly killed his wife. The psychiatrist concluded that the defendant suffered a type of amnesia which prevented the defendant from recalling anything from the day of the murder to the day of the defendant's testimony during the second week of trial. A somewhat less decisive psychiatrist for the State described defendant's condition as a "convenient amnesia." The trial court refused to order a fitness hearing.

The supreme court reversed, concluding that a *bona fide* doubt of

the defendant's fitness arose on the day of his testimony when he appeared confused as to the proceedings in court. The significant factor compelling the court's conclusion was the apparently substantial change which occurred in the defendant's condition on or shortly before the day he testified in a confused manner together with the psychiatrist's testimony with regard to that testimony. The court commented that the State's psychiatrist did not dispel the doubt as the State's psychiatrist's opinion was based upon mere impressions. *People v. Stanhope* (1969), 44 Ill. 2d 173, 179, 254 N.E.2d 512.

By contrast, in the case at bar, we have a defendant who testified in a very detailed and erudite manner about his entire life up to and including a point two or three minutes before the shooting. In fact, he was able to testify as to the victim's provocative conduct while they were in each other's presence. He was able to detail the shootings and the victim's response thereto as well as all of his activities after the shootings except for accounting for the presence of the weapon among some towels on the table on the second floor. Thus, in contrast to *Stanhope*, we have neither the complaint by counsel that the defendant is unable to assist in his defense, nor do we have the confused and disoriented testimony that the supreme court relied upon in *Stanhope* and, therefore, defendant's reliance on *Stanhope* is misplaced.

As we have previously indicated, the trial court was not obligated to accept a possible inference from Dr. Rossiter's testimony regarding defendant's amnesia that he would be unable to assist in his defense. (See *People v. Deizman* (1976), 44 Ill. App. 3d 829, 358 N.E.2d 1208.) Furthermore, in contrast to our *People v. Williams* (1980), 87 Ill. App. 3d 860, 409 N.E.2d 439, there was evidence other than that of the psychiatrist, which the trial court could consider in deciding whether to order a fitness hearing *sua sponte*. We conclude the trial court did not err in failing to order a fitness hearing.

Defendant next argues that he was denied his fourteenth amendment due process rights to confront and cross-examine witnesses against him. He contends the trial court erroneously failed to conduct a competency hearing prior to the testimony of defendant's mother, Mable Schwab. It appears that she was the only occurrence witness other than the defendant and that she suffered three strokes between the date of the offense and the date of the trial. Defendant relies on the fact of the strokes and that Mable allegedly contradicted herself at trial in that she attributed a statement to defendant rather than to Jigger. A police witness testified that the witness told him that defendant, James Schwab, said "Don't throw it away, don't

throw it out; I'll mend it. It was given to my mom and dad for their anniversary. They liked it." At trial, however, she attributed this statement to Jigger.

We find no objection to the testimony of Mable Schwab in the record nor any post-trial motion complaining of the failure of the court to order a competency hearing for this witness. Where a party raises a question for the first time on appeal it is considered waived, and it may not be considered by the reviewing court. (*People v. Hoskins* (1984), 101 Ill. 2d 209, 219, 461 N.E.2d 941.) Nevertheless, while the rule of waiver is binding on the parties, it does not bind the court (101 Ill. 2d 209, 219, 461 N.E.2d 941) and we will address the issue.

▪▪▪ The test of competency of a witness is one of intelligence and understanding. In the absence of a statute, a person mentally impaired is not incompetent if he understands the nature of an oath and has sufficient mental power to give a correct account of what he has seen and heard. (*People v. Dixon* (1961), 22 Ill. 2d 513, 515, 177 N.E.2d 244.) The determination of a witness' competency may be made by observing the witness' demeanor and ability to testify during the trial, and the determination is within the discretion of the trial court. (*People v. Blair* (1986), 146 Ill. App. 3d 186, 193, 496 N.E.2d 1066.) Any inconsistencies in a witness' answer merely affect the witness' credibility and the weight to be accorded the witness' answers. (146 Ill. App. 3d 186, 193, 496 N.E.2d 1066.) Evidence which tends to impeach the testimony of a witness affects the credibility of the witness and not his competence to testify. *People v. Mathis* (1967), 82 Ill. App. 2d 173, 176, 225 N.E.2d 808, 809.

▪▪ Our examination of the record of Mable Schwab's testimony demonstrates that she answered all questions put to her without hesitation, her testimony was not internally contradictory, and she appeared to have no difficulty recalling the events about which she was called upon to testify. There was simply no evidence that this witness was mentally impaired or in any way lacking in testimonial capacity. We conclude no error was committed in failing to order a competency hearing prior to receiving the testimony of Mable Schwab. See *People v. Seel* (1979), 68 Ill. App. 3d 996,1005, 386 N.E.2d 370.

The judgment of the circuit court of De Kalb County is affirmed.

Affirmed.

REINHARD and UNVERZAGT, JJ., concur.