THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ALFRED BROWN, Defendant-Appellant.

First District (5th Division)   No. 1—90—3305

Opinion filed December 4, 1992.

Rita A. Fry, Public Defender, of Chicago (Greg Koster, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Maureen Harton, and Patrick Finley, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE McNULTY delivered the opinion of the court:

Following a plea of guilty to two counts of felony murder, aggravated arson, and arson, defendant Alfred Brown was sentenced to natural life in prison. Defendant now appeals, alleging that his plea was involuntary pursuant to amendments VI and XIV of the United States Constitution and section 104—11(a) of the Code of Criminal Procedure of 1963 (U.S. Const., amends. VI, XIV; Ill. Rev. Stat. 1989, ch. 38, par. 104—11(a)), as it was not made knowingly, and that the trial judge erred by denying his motion to withdraw the guilty plea. For the reasons which follow, we affirm the judgment of the trial court.

At defendant's trial, which commenced on September 10, 1990, Chicago fireman Nicholas Infante testified that at 2:45 a.m. on October 23, 1988, he responded to a fire call at 3148 West Jackson in Chicago. Additional trial testimony established that the fire had been deliberately set and that two bodies had been discovered in the wreckage. In the course of the investigation, police had interviewed defendant, who agreed to accompany them to area headquarters for questioning, which did in fact lead to defendant's formal arrest and court-reported statement. In his statement defendant acknowledged that he and a man named "Jerry" went into an alley behind 3148 West Jackson and set a fire for "kicks." Defendant further stated that he did not like one of the victims because he had called defendant

a drunk a few days earlier. Later defendant admitted that he alone had started the fire and had implicated "Jerry" because of a fight with him.

Before trial commenced defendant had filed a motion to suppress his out-of-court statements. A hearing was held on this motion, but a transcript of this hearing was not made a part of the record on appeal. On the day of defendant's jury trial, but before it began, the court denied defendant's motion to suppress and defense counsel stated for the record that nothing had occurred at the suppression hearing that was beneficial to defendant's case.

On the third day of trial, defense counsel informed the court that defendant had offered to plead guilty in exchange for a sentence of 60 years' imprisonment. The court informed defense counsel that since the case was in its third day of jury trial he would neither "conference" the case nor participate in plea negotiations at that point, but would accept only a blind plea to the charges, the available sentencing alternatives for which were natural life imprisonment or death.

After further consultation with defendant, defense counsel informed the court that they had advised defendant about the consequences of a blind plea of guilty and that he wished to consult with family members before deciding what to do. The court then passed the case to give defendant an opportunity to talk with his family.

When the case was recalled, defense counsel informed the court that defendant would be entering a blind plea of guilty.

The court admonished defendant that if he pled guilty to the offenses of aggravated arson and two counts of murder, with one count for each victim, the only two sentences possible were natural life imprisonment without parole, or death, and asked him if he understood. Defendant responded affirmatively. The court also informed defendant of the maximum and minimum sentences available for aggravated arson and arson, and again defendant said he understood. Next, the court told defendant that he had a right to continue to plead not guilty, but that if he pled guilty his jury trial would end and he would give up his right to confront the State's witnesses and present a defense. When defendant said he did not understand those rights, the court further explained to defendant that he was giving up his right to testify in his own defense, to present any witnesses and to put on a defense. Defendant then stated that he understood.

Defendant also admitted that no one had forced, threatened him or made promises to him to induce his guilty plea. Defendant further stipulated to the factual basis for the plea.

The court then found that defendant had waived his rights knowingly and intelligently, and had voluntarily entered into the guilty plea. The court further found that defendant knew that the court was bound by no plea agreement and that the court alone would determine the sentence. The court then confirmed that the prosecution still sought the death penalty, ordered a presentence report, and continued the case for a sentencing hearing.

On the date of the sentencing hearing defendant filed a motion to vacate his guilty plea and judgment entered thereon pursuant to Supreme Court Rule 604(d). 134 Ill. 2d R. 604(d).

At the hearing on this motion, defense counsel noted that the pretrial psychiatrist's report found defendant fit for trial with medication. Counsel then stated that after the entry of the plea, defendant had informed counsel that he had not taken his prescribed medication, lithium, either during trial or before entering his plea of guilty. Counsel then argued that defendant's failure to take the lithium placed him under severe emotional distress and depression, thus rendering him unfit to stand trial or to enter into a guilty plea voluntarily. Appended to the motion to vacate the guilty plea was defendant's handwritten statement setting forth his reasons for pleading guilty. Defendant's handwritten statement listed four reasons explaining his decision to plead guilty: *first*, his failure to get his inculpatory statement suppressed; *second*, his emotional distress; *third*, his ceasing to take the medicine for one day which caused high blood pressure, blurry vision and a desire to "charge energy level"; and *fourth*, his going to the law library.

The court examined the transcript of the guilty plea proceedings, together with defendant's handwritten statement appended to his motion to withdraw the plea. Thereafter, the court found defendant to be cognizant, rational, not extremely disturbed and not proven mentally ill "now or then." It then denied the motion to withdraw his plea, conducted a sentencing hearing (at which defendant addressed the court and for the first time denied commission of the offense) and sentenced defendant to natural life imprisonment.

The question of whether a *bona fide* doubt of defendant's fitness to stand trial has been raised rests largely within the discretion of the trial court. (*People v. Schwab* (1986), 151 Ill. App. 3d 424, 502 N.E.2d 815.) The reviewing court in *Schwab* observed: "The person most likely to be aware of the inability of defendant to adequately assist in the presentation of his defense would be defense counsel." (*Schwab*, 151 Ill. App. 3d at 431-32, 502 N.E.2d at 820.) Yet defense counsel in the instant action, like defense counsel in *Schwab*, never indicated his

client's inability to comprehend the charges against him. Furthermore, counsel never stated that defendant was unable to understand either the consequences of offering to plead two days into trial, or the ramifications of a blind guilty plea. Defense counsel did not raise any questions about defendant's fitness to enter such a plea and told the court only that defendant requested that he be allowed to confer with his family before entering the plea.

Additionally, before accepting defendant's guilty plea, the court gave defendant admonishments that met and exceeded those required by Supreme Court Rule 402. (134 Ill. 2d R. 402.) Defendant responded affirmatively to the question of whether he understood each and every admonishment. Defendant affirmed that he read and wrote the English language, that the court and not the jury would determine the sentence, and that he understood the only sentences available for the crimes to which he was pleading guilty were death or natural life imprisonment with no chance of parole.

At one point in the guilty plea proceedings, defendant stated that he did not understand certain rights he had and the following colloquy took place:

"THE COURT: You have a right to persist in your previously entered plea of not guilty. By pleading guilty *** do you understand that there will no longer be a trial *** you will have no trial of any kind, which means that you're giving up your right to further confront any witnesses who appeared to testify against you, and have your lawyer cross-examine those witnesses, to have your attorney present any evidence that you feel you might have. Do you understand?

MR. BROWN: I don't understand those rights.

THE COURT: In other words, by pleading guilty the trial will end, you will no longer have a right to, for example, take the stand in your own defense or on your own behalf to present and call witnesses *** to testify for you during the course of the trial, and to present any defense in the trial. Do you understand?

MR. BROWN: Yes, sir."

At the conclusion of the plea proceeding, defense counsel addressed the court, informing it for the first time that defendant's guilty plea had been against counsel's advice, stating as follows:

"MR. GREZECA [Assistant Public Defender]: I explained to him [defendant] our entire trial strategy, and our willingness and our advice to go ahead with this trial, and he's wishing— Alfred, are you still wishing to plead guilty at this time?

MR. BROWN: Yes, I am.

THE COURT: The remarks are of record. Mr. Brown are you satisfied with the professional services you received from the Cook County Public Defender's Office?

MR. BROWN: Yes, I am."

No issue was raised by any party before or during these proceedings concerning defendant's fitness to enter a guilty plea. Accordingly, the court found that based on defendant's demeanor during the suppression motion, his conduct at trial and his reasoning as set forth in his motion to vacate that defendant had been fit to enter a guilty plea. Furthermore, because proper admonishments had been given as required by Supreme Court Rule 402 (134 Ill. 2d R. 402), the motion to vacate was denied.

Prior to pronouncing sentence the court remarked that it believed that defendant had been disturbed in his life from time to time, but was of the opinion that defendant was cognizant and aware before trial, during trial and also at the present. Although the court found defendant's handwritten exhibit appended to the motion to vacate his plea to be rambling, inarticulate and repetitive, it further concluded that it did not demonstrate that defendant, either now or then, was mentally ill.

■ It is fundamental law that an unfit person may not plead, be tried, convicted or sentenced. To be fit a person must understand the nature of the proceeding and be able to cooperate in his or her defense. *Boykin v. Alabama* (1969), 395 U.S. 238, 23 L. Ed. 2d 274, 89 S. Ct. 1709; *Pate v. Robinson* (1966), 383 U.S. 375, 15 L. Ed. 2d 815, 86 S. Ct. 836; *People v. Murphy* (1978), 72 Ill. 2d 421, 381 N.E.2d 677; *People v. Salvaggio* (1976), 38 Ill. App. 3d 482, 348 N.E.2d 243.

In his appeal from the trial court's denial of his request to vacate his guilty plea and order a fitness examination, defendant relies principally on *People v. Jackson* (1978), 57 Ill. App. 3d 809, 373 N.E.2d 583. In *Jackson*, the defendant had an initial fitness hearing at which a psychiatrist testified that defendant understood the nature of the proceedings, but due to his mental illness was unable to cooperate with his counsel in his own defense. Based upon that testimony Jackson was found unfit to stand trial.

At a second fitness hearing conducted about six months later, the *Jackson* court found the defendant fit after the same psychiatrist testified that defendant understood the charges and that, with medication (tranquilizers), he could cooperate with his counsel. The trial commenced and concluded, after which the court scheduled a sentencing hearing one month later and ordered a fitness examination with the

findings to be submitted at sentencing. When the sentencing hearing began the court was informed that the defendant had not been examined for fitness as ordered and that prior to the present hearing had not received the medication necessary to maintain his fitness. Notwithstanding this information the court imposed sentence on the conviction. The reviewing court held that the trial court erred in failing to order *sua sponte* a fitness examination to determine whether defendant was fit to be sentenced. The holding in *Jackson* was premised upon two bases: *first*, the reviewing court found that "[b]ecause the [trial] court's finding of fitness prior to trial was based upon medical testimony that defendant was able to cooperate with his counsel only while being maintained with the prescribed medication and that at the time of sentencing he had not received his medication, we believe a bona fide doubt was raised as to his fitness" (*Jackson*, 57 Ill. App. 3d at 814, 373 N.E.2d at 587); *second*, the trial court had indicated its own concern about defendant's fitness when it ordered the presentence fitness examination, which had not been performed at the time of the sentencing hearing.

The facts of the case at bar are quite different from those in *Jackson*. Alfred Brown had never been found unfit, nor had a fitness hearing been requested or conducted prior to his trial and plea. He had been examined by three separate psychiatrists at three separate times and had been found fit for trial. On the day of trial, the court had a written report signed by psychiatrist Dr. Gerson Kaplan that defendant was fit to stand trial with medication. At no time prior to his motion to withdraw his guilty plea had defendant advised the court that he had failed to take his medication nor had counsel for any party requested a hearing on defendant's fitness. Unlike *Jackson* there had been no fitness hearings at which there was psychiatric testimony that defendant's fitness for trial could only be maintained by continued use of prescribed medication. In addition, in the case at bar, after the acceptance of the guilty plea no party requested, nor does the record reveal any facts that would have prompted the court *sua sponte* to order a determination of fitness to be sentenced. Therefore, we are of the opinion that *Jackson* is not determinative of the outcome in this case.

In *People v. Murphy* (1978), 72 Ill. 2d 421, 381 N.E.2d 677, the supreme court stated that the determination of whether there is a *bona fide* doubt of fitness for trial depends upon the facts of each case. The court held that counsel's suggestion that defendant had limited mental capacity is not sufficient to raise a *bona fide* doubt of defendant's fitness for trial where other evidence pointed clearly to

defendant's comprehension of his predicament and the import of the proceeding.

The relation between a history of mental illness, administration of medication, *bona fide* doubt of fitness to plead, and administration of medication during pretrial incarceration was discussed in *People v. Daubman* (1989), 190 Ill. App. 3d 684, 546 N.E.2d 1079. In *Daubman* defendant entered a negotiated plea to murder in exchange for an agreed sentence of life imprisonment without possibility of parole. Prior to accepting the plea the court fully admonished defendant pursuant to Supreme Court Rule 402, including the sentence to be imposed and the defendant responded that he understood the admonitions and that his plea was voluntary.

Later, defendant filed a motion to withdraw his plea on the grounds that: (1) he had only an eighth-grade education; (2) he had continually used drugs and alcohol from age 12 to the present; and (3) while incarcerated had been seen by medical doctors who prescribed Mellaril and that his ingestion of 10 milligrams on the date of his plea hearing had made him "spacey." The record further revealed that Dr. Ziporyn, a psychiatrist, diagnosed the defendant as a juvenile as suffering from "brain syndrome." Defendant also testified that he had been examined during his pretrial incarceration by a psychiatrist, Dr. Taugott, whose evaluation his attorneys had advised him was not helpful to his case. The trial court refused to vacate defendant's plea.

The reviewing court upheld this ruling, finding that the foregoing facts were not sufficient to raise a *bona fide* doubt of defendant's competence to plead. The court noted that the record demonstrated that defendant made clear and articulate responses at the plea hearing and the withdrawal motion hearing indicative of his understanding of both proceedings. There was nothing in the trial court's personal observation of defendant to alert the court that defendant was not fit to plead.

In *Daubman*, as in the case at bar, defendant had never been found unfit. In *Daubman*, the court had to consider the defendant's mental history and his ingestion of Mellaril as it bore on the issue of defendant's fitness to plead. In the present case the court had to consider defendant's mental history and his failure to take prescribed medicine as it related to the question of fitness to plead. In *Daubman* the reviewing court found that the trial court's opportunity to observe defendant and evaluate his responses at the plea hearing and motion to withdraw hearing amply supported the trial court's conclusion that he was fit to plead. In the present case the trial court's opportunity to observe defendant was greater than that in *Daubman*.

Finally, a brief discussion of a recent case which considered the effect of failure to take prescribed medication on fitness to stand trial is in order.

In *People v. Hall* (1989), 186 Ill. App. 3d 123, 541 N.E.2d 1369, a fitness hearing was conducted. The State's psychiatrist testified that defendant would be fit to stand trial if he received antipsychotic medication. He also stated that, without the medication, defendant could regress to his previous state, although not immediately, but over several weeks. The trial court found defendant fit to stand trial after the parties stipulated that the defense psychiatrist agreed that defendant would be fit with medication.

After a jury returned a verdict against the defendant, defense counsel requested a presentence fitness examination. Counsel based his request on information that defendant had not taken his medication on the day the jury returned the verdict. The trial court denied this request. In upholding the trial court's decision, the reviewing court found that counsel's request was based on his concern that defendant continue to take his medication up to the time of sentencing, and "was not based on any knowledge that defendant had not been taking his medication prior to that day or would not take it thereafter." (*Hall*, 186 Ill. App. 3d at 132, 541 N.E.2d at 1375.) "Defense counsel's first post-trial statements to the court regarding defendant's fitness provided little support, if any, for a finding of *bona fide* doubt of fitness, either to stand trial or to be sentenced." *Hall*, 186 Ill. App. 3d at 132, 541 N.E.2d at 1375.

Prior to defendant's sentencing, defense counsel informed the court that defendant had not received his medication since his transfer to Division VI of the Cook County jail, about one month before trial. He further stated that defendant had been found in the past to require medication to be fit for legal purposes. Finally he informed the court that the probation officer who conducted the presentence interview described defendant as "somewhat distant to reality." (*Hall*, 186 Ill. App. 3d at 132, 541 N.E.2d at 1375.) Again, the trial court denied counsel's request for a fitness examination.

In affirming the trial court's ruling, the appellate court stated:

> "In contrast to his prior post-trial statements to the court, defense counsel did state on May 21 [the date of the sentencing hearing] that 'it was [his] knowledge' that defendant had not received any medication in Division VI. *** While defense counsel, as an officer of the court, must be presumed to have spoken truthfully regarding his 'knowledge' [citation], his failure to state any underlying facts prevented the trial court from

*independently* evaluating the reliability of that knowledge. \* \* \*
Defense counsel's statements to the trial court, prior to defendant's sentencing, thus failed to raise a *bona fide* doubt of fitness.

Moreover, neither defendant's prior psychiatric history nor the probation officer's observation required the trial court to grant a fitness examination or hearing. In this regard, we do not believe the court abused its discretion in relying, instead, upon its own observations of defendant throughout the trial [citation] and its observation and questioning of him prior to sentencing [citation] to deny the request for a fitness examination." (Emphasis in original.) *Hall*, 186 Ill. App. 3d at 132-33, 541 N.E.2d at 1375.

See also *People v. Ralon* (1991), 211 Ill. App. 3d 927, 570 N.E.2d 742.

■ Applying the court's analysis in *Daubman* and *Hall* to the facts in the case at bar, it is apparent that the trial court did not abuse its discretion by refusing to allow defendant, Alfred Brown, to withdraw his plea or to order a fitness examination.

First, defendant Brown like Daubman had never been found unfit. In fact he had been found fit on three different occasions by three different doctors.

Second, although the letter from the psychiatrist found defendant fit for trial with medication, there was no testimony from anyone or other evidence indicating that defendant's failure to take his prescribed medication would render him unfit.

Third, as in *Hall*, defense counsel's statement that defendant had not been taking his medication was based upon defendant's statement alone without any other evidence permitting the trial court to make an independent assessment of its effect on defendant's ability to understand and participate in the court proceedings.

Fourth, unlike the probation officer's assessment in *Hall* that Hall was "somewhat distant to reality," defendant Brown's probation officer in his presentence report described him as quite cooperative.

Fifth, the trial court had extensive opportunities to observe defendant at numerous proceedings above described. Initially the court conducted a suppression hearing. The transcript of that hearing was not made part of the record on review. Defense counsel's remarks included in the record on review, however, indicated that information adduced at that hearing was not helpful to the defendant. We take that remark at face value as it bears on the issue of defendant's fitness to be tried or to plead.

Finally, after the motion to withdraw his plea had been denied, the sentencing hearing commenced. The court again had an opportunity to observe defendant when he exercised his right of allocution and addressed the court. In that address he acknowledged the efforts of his attorneys to get his guilty plea withdrawn. He then addressed the families of the fire victims and denied complicity in the crimes. This behavior does not indicate a lack of understanding of the proceedings and further supports the court's conclusion that no *bona fide* doubt of fitness had been raised.

For the reasons set forth above, we affirm.

Affirmed.

LORENZ and MURRAY, JJ., concur.