THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
GARY DAUBMAN, Defendant-Appellant.

Fifth District   No. 5—87—0565

Opinion filed October 31, 1989.

Daniel M. Kirwan and Mary M. Menard, both of State Appellate Defender's Office, of Mt. Vernon, for appellant.

Kenneth R. Boyle and Stephen E. Norris, both of State's Attorneys Appellate Prosecutor's Office, of Mt. Vernon, for the People.

JUSTICE LEWIS delivered the opinion of the court:

Defendant, Gary Daubman, was charged by indictment with murder, conspiracy to commit murder, and the unlawful use of firearms by a felon. On April 2, 1987, the defendant entered a negotiated plea of guilty to the count of murder, the remaining counts were dismissed and an agreed sentence of natural life imprisonment was imposed by the court. Subsequently, the defendant filed a motion to withdraw his guilty plea which was denied. The defendant now appeals the court's denial of his motion to withdraw his guilty plea.

The defendant raises two issues on appeal. The defendant first contends that the circuit court erred in failing to determine if the defendant's guilty plea was "understandingly" made and that the court erred in denying his motion to vacate the guilty plea when there was evidence that the defendant was not competent at the time of the plea. The defendant's second issue is that the circuit court erred in

sustaining his counsel's objection to introduction of evidence of the defendant's psychiatric records as those records were not protected by a physician/patient privilege and as any confidentiality had been waived when the defendant waived the attorney/client privilege. Because of the nature of the defendant's issues, a statement of facts is not necessary at this juncture, but a discussion of the pertinent facts will be set forth under the consideration of each issue.

In the defendant's first issue, he argues that it is "possible" that his guilty plea was not entered "understandingly" because of his "alleged mental illness." In conjunction with this issue, the defendant further states that the circuit court's inquiry was not adequate as to whether the defendant's guilty plea was voluntary and knowing, given the evidence before the court of the defendant's lack of mental capacity, and that the circuit court should have granted the defendant's motion to withdraw his guilty plea on that basis. In support of his argument, the defendant notes that the court was aware that a psychiatrist had examined the defendant; and in addition, that the court adopted the sentencing recommendation agreed to by the State's Attorney and defense counsel that the defendant be placed in the psychiatric unit at Menard Correctional Center. Our review of the record reveals that the circuit court did determine that the defendant's guilty plea was entered voluntarily, knowingly and understandingly and that the court did not abuse its discretion when it denied the defendant's motion to withdraw his guilty plea.

At the guilty plea hearing, the State set forth the terms of the plea agreement. The State's Attorney stated that the defendant had agreed to enter a plea of guilty to the offense of murder, and in exchange, the State would dismiss the other two charges of conspiracy to commit murder and the unlawful use of a firearm by a felon. Additionally, the State had agreed to forego seeking the death penalty, which the State believed could be imposed pursuant to section 9—1(b)(8) of the Criminal Code of 1961, as the facts would show that the murder was committed to prevent the victim from giving material assistance to the State in an investigation or from testifying in a proceeding against Doug and Tammy Fyke, drug dealers at whose behest the defendant shot the victim. (Ill. Rev. Stat. 1987, ch. 38, par. 9—1(b)(8).) The State recommended that the defendant be sentenced to natural life imprisonment, as the State believed the murder of the victim was accompanied by brutal and heinous behavior indicative of wanton cruelty. As part of the negotiated plea, the State and the court were to recommend that the defendant be housed in the psychiatric unit of Menard Correctional Center with the understanding by

the defendant that the Department of Corrections may or may not consider this recommendation.

The State also advised the court that, although it was not part of the negotiated plea, the defendant had obtained letters of "no prosecution" from the State's Attorney of Macoupin County for an aggravated criminal sexual assault charge and from the State's Attorney of Madison County for a murder charge. The conditions of the "no prosecution" letters were that the State's Attorneys would not prosecute the defendant for those offenses if he pleaded guilty to murder in the instant case and was sentenced to a term of natural life imprisonment.

The defendant's counsel stated that the State's Attorney correctly stated the plea agreement. While the defendant denied that the murder was a contract killing, he did agree that the facts would show that the defendant was promised compensation. The defendant further disagreed that the murder was accompanied by brutal and heinous behavior or that the evidence would be sufficient to show that the murder was done to prevent the victim from testifying or participating in a prosecution of another. The defendant's counsel stated that the strategic decision behind accepting the plea agreement was to avoid the death penalty.

After hearing the plea agreement, the court inquired of the defendant whether he understood the agreement that was discussed, and the defendant responded that he understood. The defendant further agreed that the agreement was the agreement into which he had entered.

The court asked the State's Attorney for the stipulation of the defendant's prior criminal history. The State's Attorney advised the court that the defendant had been adjudicated delinquent in July of 1981 for an unlawful restraint charge and that the defendant had had a conviction for rape for which he had received a sentence of six years' imprisonment. At the time of the current offense, the defendant was on parole from the prior rape conviction. The court asked the defendant if he concurred in this statement of his criminal history and if the statement was accurate, and the defendant answered affirmatively.

The court accepted the defendant's written plea of guilty, and at that time, recited the charge of the bill of indictment for murder, *i.e.*, that the defendant had, without lawful justification, shot Robert Alderson, Jr., in the head with a handgun thereby causing the death of the victim. When asked by the court if the defendant understood the charge, the defendant stated that he did, and he admitted that he

had signed the written guilty plea.

The court proceeded to advise the defendant that the maximum penalty that could be imposed for the offense of murder was the death penalty and that the minimum penalty was 20 years' imprisonment. The court explained to the defendant that the State's Attorney had recommended that the defendant be sentenced to natural life imprisonment and that this sentence did not provide for the possibility of mandatory release. The court inquired as to whether the defendant understood the possible penalties and the recommended penalty, and the defendant responded that he understood.

The court further questioned the defendant as to whether he had been coerced into pleading guilty through threats or promises; as to whether the defendant was pleading guilty voluntarily and of his own free will; if the defendant was satisfied with his counsel's representation in this case; and if the defendant was satisfied with his plea agreement. To each of these inquiries, the defendant responded affirmatively.

The court next admonished the defendant as to his rights. The court explained that, by entering a plea of guilty, he was waiving his right to a trial of any kind, a bench trial or a jury trial; that he was giving up the right to confront witnesses and to subpeona witnesses to testify in his behalf; and that the defendant was relinquishing his presumption of innocence. The defendant indicated that he understood that he was giving up these rights by entering his plea of guilty.

After admonishing the defendant, the court requested that the State present the factual basis for the plea. The State's Attorney complied by reciting the following facts: On September 7, 1986, the body of Robert "Red" Alderson, Jr., was found in an area known as Hickory Hill Bottoms (the Bottoms). The body was severely burned, but the autopsy revealed that the cause of death was three gunshot wounds at point-blank range to the victim's head and that the burning of the body of the victim occurred after death. On September 9, 1986, the defendant was arrested on an arrest warrant from Macoupin County for the offense of rape. While in custody and during interrogation for the rape charge, the defendant made a written statement admitting to Robert Alderson's killing.

In the defendant's statement, it was established that on September 4, 1986, the defendant, Frank Volkmar and Paul Potts came to Salem, Illinois, to the home of Doug and Tammy Fyke. Tammy Fyke asked the defendant to kill Alderson, and the defendant agreed to do so. That day, Tammy and Gail Rankin took the defendant out to the Bottoms and showed the defendant how to use the .25 caliber pistol

that the defendant had brought with him. The defendant practiced target shooting with the gun and then the three of them returned to Tammy's home.

Later, the defendant and Rankin returned to the area where they had been previously that afternoon, with the defendant armed with the .25 caliber pistol. Shortly thereafter, Tammy arrived with Alderson. Alderson got out of the car and was searched for weapons. The defendant's statement revealed that Alderson had been lured to the scene under the pretext that his girlfriend was being held captive and that Alderson was to come with Tammy to gain her release.

The defendant ordered Alderson to lie facedown on the ground, and the defendant placed his gun to the back of Alderson's head. According to the defendant's statement, Alderson stated that he knew the defendant was going to shoot him, whereupon the defendant shot Alderson in the head twice. The defendant backed away from the victim, and as he did so, he shot Alderson in the head a third time.

The defendant left the scene of the shooting with Tammy and returned to the Fykes' residence. Rankin likewise left the area but in a separate car. Back at the Fykes' home, the defendant and the others considered how to dispose of the murder weapon, their clothes, and Rankin's car. Volkmar, Potts, and the defendant then left Salem and returned to Alton, Illinois.

In the next few days following the murder, the defendant admitted that he, with Volkmar's assistance, disposed of his gun and his clothing which he had worn the day of the crime. The gun was thrown into the Hartford canal. The authorities subsequently recovered the weapon after they were shown the location by the defendant.

At some time after the crime, the defendant admitted that he talked with Tammy on the telephone and he was told by her that he was to be paid $500 for killing Alderson and that he would be paid by Volkmar for Tammy. Volkmar was to subsequently reduce the amount of money which he owed Tammy by this amount.

The State advised the court that the testimony of codefendant Paul Potts would establish that on September 3, 1986, Potts, the defendant and Volkmar were at Volkmar's house. Volkmar stated that Tammy had called him and said that she wanted a person by the name of "Red" killed as he was a "narc" and a threat to Tammy. Potts would further testify that Volkmar stated that the defendant had agreed to do this since the defendant needed money to get out of Alton because the police were seeking him for a rape charge. The killing of Alderson would serve the dual purpose of doing a favor for Tammy and of insuring Potts and Volkmar a supply of cannabis. The

defendant acknowledged to Potts that what Volkmar stated was agreeable to the defendant.

Potts' testimony would corroborate the defendant's statements that Potts, Volkmar and the defendant came to the Fykes' home on September 4, 1986. The defendant told Potts that he was being paid to "take care of" Alderson, but that he would not receive payment until after the killing was done.

Potts' testimony would further establish that two weeks prior to the killing, Doug and Tammy Fyke came to Volkmar's residence when he and the defendant were present. After the Fykes left Volkmar's home, Ray Volkmar, Frank Volkmar's brother, stated that Tammy wanted a man in Salem killed as he was a "narc" and a threat to her.

The State advised the court that it was prepared to present testimony that Alderson's girlfriend, as part of the plan to murder the victim, was taken to a motel on September 4, 1986, and was paid to be with Frank Volkmar. Alderson was advised that his girlfriend had been taken, and Alderson had told a man by the name of Joe Monkow that he was to meet with some people alone to obtain his girlfriend's release.

Given the foregoing statement of the facts, the court found that there was a factual basis for the defendant's guilty plea, and the court further found that the murder was accompanied by brutal and heinous behavior indicative of wanton cruelty. The court determined that the defendant was eligible for a sentence of natural life imprisonment.

Defendant's counsel disputed the court's findings that the defendant's actions were brutal and heinous such as to be indicative of wanton cruelty. Defense counsel pointed out that the defendant did not participate in the burning of the victim's body and that the defendant confessed to the offense and, therefore, his actions cannot be considered brutal and heinous. Counsel denied that the evidence was sufficient to show that the victim was killed to prevent him from assisting the State in a prosecution of another. Counsel lastly noted that the defendant initially agreed to harm Alderson, and that it was only after he had ingested a large quantity of cocaine that he was induced to murder the victim. Given these objections, counsel agreed that the factual basis for the plea was otherwise accurate.

The court overruled the defendant's objections, found that the defendant had knowingly and voluntarily entered his guilty plea, and sentenced the defendant to natural life imprisonment. In addition, the court accepted the recommendation of the parties that the defendant be housed in the psychiatric unit at Menard Correctional Center. The court asked the defendant if he understood that this was a recommen-

dation only and that the Department of Corrections could place him as it saw fit. The defendant stated that he understood. The court concluded by advising the defendant of his appeal rights, which the defendant indicated he understood. The court asked the defendant if he had any questions, and the defendant responded that he did not.

The evidence presented at the defendant's motion to withdraw his guilty plea consisted of the defendant's testimony and the testimony of John McGuire, the attorney who represented the defendant at the guilty plea hearing. The defendant's testimony established that he had attended school ˜through the eighth grade, at which time he was thrown out of school because of his drug-related activities. The defendant admitted that he had begun using drugs and alcohol when he was 12 years of age and that he continued to do so. While in school, the defendant attended special education classes because he was a slow learner. The defendant testified that he was virtually illiterate, and when people used "big words" and talked in complicated long sentences, he had difficulty in understanding.

The defendant recalled being arrested for another offense on September 9, 1986. While incarcerated, the defendant had been seen by medical doctors but he was unable to recall any of the doctors' names. The defendant saw the doctors for his nerves because he was unable to keep his food down. The defendant was prescribed Mellaril for his condition, and he had taken 10 milligrams of Mellaril on the day of his guilty plea. This drug made him "spacey." The defendant stated he did not pay much attention to what transpired at his guilty plea hearing as he had trouble following what the judge was saying. The defendant said it was his understanding that if he pleaded guilty, the most extensive sentence he could receive was a sentence of natural life imprisonment, but that he did not believe that this sentence would be automatically imposed. If he had known that he was to receive a life sentence, the defendant stated he would not have pleaded guilty.

The defendant testified that when he was a juvenile, he was treated by Dr. Ziporyn, a psychiatrist. According to the defendant, Dr. Ziporyn had the defendant undergo a brain scan, which showed that the defendant suffered from "brain syndrome." The defendant's attorney, McGuire, had obtained Dr. Ziporyn's records and had read and explained them to the defendant.

The defendant stated that he had many discussions with his attorney and that they often discussed the possibility of the defendant receiving the death penalty. His attorney told the defendant about the potential charges in the other counties, and about statements made by the defendant to other persons in jail with the defendant. The defend-

ant believed that his attorney told him of these things in order to frighten the defendant into pleading guilty.

The defendant understood that his attorney had obtained a psychiatric examination for him through a motion before the court. Dr. Traugott was the psychiatrist who examined him. The defendant did not receive the written results of Dr. Traugott's examination until after he entered his guilty plea; however, McGuire had explained the results of the examination to him before entering his plea. McGuire told the defendant that Dr. Traugott's results were not helpful to the defendant's case and that, in fact, the doctor's report essentially destroyed the defendant's defenses. Upon hearing this, the defendant asked McGuire to get another psychiatrist appointed, as the defendant did not believe the psychiatrist had done what he should have. McGuire advised the defendant that he did not think that the court would favor a second request.

John McGuire, the defendant's attorney at the guilty plea hearing, testified that he had determined that the defendant may have a possibility of an insanity or intoxication defense so he petitioned the court for the appointment of a psychiatrist. Dr. Traugott was appointed, and he conducted an examination of the defendant. McGuire corroborated the defendant's testimony that Dr. Traugott's report was not helpful to the defendant's case. McGuire stated that he did not receive Dr. Traugott's written report of his examination of the defendant until after the defendant entered his guilty plea, but that he had obtained the results of the examination by telephone from the doctor prior to the plea. McGuire conveyed the results of the examination to the defendant. After advising the defendant of the doctor's report, the defendant told McGuire that he wished to persist in his plea negotiations. McGuire admitted that the defendant asked him to get another psychiatrist appointed but that he did not do this.

McGuire stated that he was not satisfied with Dr. Traugott's methodology in conducting his examination of the defendant. On cross-examination, McGuire admitted that he gave Dr. Traugott all of the defendant's medical records to review, including Dr. Ziporyn's records, that Dr. Traugott was aware of the facts of the case, and that the doctor conducted a personal interview of the defendant. McGuire's primary objection to Dr. Traugott's methodology was that he did not believe the doctor spent enough time with the defendant. The defendant had told McGuire that the doctor spent only a short time with the defendant; that the doctor and the defendant did not get along very well and that the doctor seemed hostile to the defendant; and that the doctor did not ask the defendant many questions or seem

very interested in the defendant. McGuire thought that if Dr. Ziporyn had examined the defendant, the doctor might have found that the defendant had a mental defect which "may" have rendered the defendant insane at the time of the offense.

McGuire testified that he thought the defendant understood the terms of the plea agreement and that the defendant understood if he accepted the plea bargain he would be sentenced to natural life imprisonment without the possibility of parole. On occasion when the defendant expressed that he could obtain an appeal and get his sentence reduced, McGuire advised the defendant that this would not be possible unless the defendant withdrew his guilty plea. McGuire admitted that the defendant entered into the guilty plea primarily to avoid the death penalty.

Based on the foregoing evidence, the court denied the defendant's motion to withdraw his guilty plea, finding that the defendant did enter his guilty plea understandingly and that while the defendant had indicated he had a history of mental illness and emotional problems, such a history did not render the decision of the defendant involuntary. We find that the court's determination was proper.

As the defendant correctly states, a guilty plea must be voluntarily, knowingly, and understandingly entered and the record must affirmatively disclose that this was done. (*Boykin v. Alabama* (1969), 395 U.S. 238, 23 L. Ed. 2d 274, 89 S. Ct. 1709.) Supreme Court Rule 402 was adopted for the purpose of assuring that a guilty plea is intelligently, understandingly, and voluntarily made. (107 Ill. 2d R. 402; *People v. Thurston* (1975), 25 Ill. App. 3d 900, 324 N.E.2d 1.) In this case, the record reveals that the defendant was thoroughly admonished under Rule 402 and, in fact, the defendant does not allege in his brief that he was not properly admonished. This fact alone gives rise to the inference that the defendant's plea was understandingly made. Further, the defendant's clear and articulate responses at the guilty plea hearing and at the motion hearing indicate no lack of understanding by the defendant. The defendant's claim at his motion to withdraw his guilty plea hearing that he did not understand the court's admonishments can only appear to be self-serving statements to escape the bargain which he now finds not to his liking. Additionally, McGuire, the defendant's attorney for the guilty plea hearing, testified at the motion hearing that the defendant did understand the plea agreement.

We next consider the second prong of the defendant's contention that the court should have granted his motion to withdraw his guilty plea since the court had evidence before it which indicated that the

defendant may not have been competent at the time of entering his guilty plea, thereby impairing the defendant's ability to understand. The evidence which the defendant notes should have placed the court on notice of the defendant's mental inadequacies was that a psychiatrist had been appointed, on the defendant's motion, and had examined the defendant, and that the court recommended that the defendant be placed in the psychiatric unit of Menard Correctional Center.

■ The record does not support the defendant's contention that the court had sufficient evidence before it to show that the defendant may not have been competent at the time of the guilty plea hearing. The only evidence of the defendant's possibility of mental inadequacy is the aforementioned facts set out by the defendant and the fact that the defendant had received treatment by Dr. Ziporyn when he was a juvenile. These facts alone were insufficient to raise a *bona fide* doubt that the defendant was not competent to plead guilty. See *People v. Blahuta* (1970), 131 Ill. App. 2d 200, 264 N.E.2d 819.

■ A defendant has a constitutional right not to be convicted if he is unfit; however, the standard for showing a defendant is unfit is that he is unable to understand the nature and the purpose of the proceedings and that he is unable to assist in his defense. (*People v. Kraus* (1984), 122 Ill. App. 3d 882, 461 N.E.2d 1036; *People v. Turner* (1982), 111 Ill. App. 3d 358, 443 N.E.2d 1167.) Here, the record demonstrates that the defendant did understand the nature of the proceedings at his guilty plea hearing, and there is no evidence to show that the defendant was unable to assist in his defense. In fact, the defendant's understanding and ability to assist in his defense are reflected in his asking his attorney to seek a second psychiatric examination. Therefore, it must be concluded that the defendant was competent at the time he entered his guilty plea.

■ Additionally, the fact that the defendant may have had a prior history of mental illness does not make him incompetent to enter a guilty plea. (*People v. Heral* (1976), 62 Ill. 2d 329, 342 N.E.2d 34.) It is significant that the defendant, after being examined by a psychiatrist, did not raise a defense of insanity or introduce the psychiatrist's report into the record. As noted earlier, the defendant's testimony at both hearings indicated that he understood what was transpiring. The circuit court stated that there was nothing in its personal observation of the defendant to alert the court that the defendant was not competent, and we agree that the record does not show any reason why the court should have inquired further to determine the defendant's competency.

■ We next consider the defendant's second issue on appeal. In

this issue, the defendant raises a unique contention wherein he challenges the propriety of the circuit court's ruling on an objection made by the defendant to the State's Attorney's questioning of the defendant's witness and wherein the court ruled favorably for the defendant on the objection. Our research of the case law reveals no cases where a defendant has appealed a ruling favorable to himself. Irrespective of whether the basis of the defendant's objection was correct, the fact remains that the defendant sought and received the result he desired. Common sense dictates that a defendant should not be allowed to claim error from a ruling he sought and which was in his favor. Therefore, we refuse to find that the court erred when it sustained the defendant's objection to the State's Attorney's questions regarding the results of the psychiatrist's examination of the defendant where the report had not been entered into evidence and where the defendant's attorney was asserting that the information contained in the report was protected by the physician/patient privilege.

We note that the basis for the defendant's argument that the court erred in sustaining the objection was that the defendant's attorney improperly objected as the information was not protected by the physician/patient privilege as that privilege did not apply and that the attorney/client privilege did not protect this information as that privilege had been waived. Because we have determined that the court cannot be held in error where it rules favorably for a defendant, we will not address whether any of the privileges raised by the defendant were applicable.

■ The defendant has argued alternatively that his counsel at the motion hearing was ineffective for erroneously objecting to the admission of the psychiatrist's reports. The standard for reviewing whether counsel is ineffective is a two-prong test: first, that the counsel's representation fell below an objective level of reasonable representation, and second, that but for the attorney's sublevel representation, the outcome of the proceedings would have been different. (*People v. Albanese* (1984), 104 Ill. 2d 504, 473 N.E.2d 1246.) If the attorney's alleged incompetence arises out of a matter of trial strategy or tactics, a defendant's claim of ineffective representation will fail as it does not meet the first prong of the two-prong test. *People v. Shum* (1987), 117 Ill. 2d 317, 512 N.E.2d 1183.

■ Here, it cannot be said that the attorney's representation fell below a standard of adequate representation as the defense attorney objected to the introduction of the psychiatrist's report as a trial strategy. The motion to withdraw the guilty plea was based in part upon the assertion that the defendant had a meritorious defense of in-

sanity or intoxication. The testimony presented by the defendant and by McGuire both established that the contents of the psychiatrist's report would have been detrimental and, in essence, would have destroyed the affirmative defenses which the defendant now claimed in his motion to withdraw were meritorious. Therefore, to preserve the defendant's claim of a meritorious defense, the defendant's counsel could not have this contradictory document introduced if he had any hope of having the motion to withdraw the defendant's guilty plea granted. Therefore, since the first prong of the two-prong test for ineffective assistance of counsel has not been met, we find that the defendant's alternative argument that his counsel was ineffective must fail.

For the foregoing reasons, the judgment of the circuit court of Marion County, denying the defendant's motion to withdraw his guilty plea, is affirmed.

Affirmed.

WELCH, P.J., and CHAPMAN, J., concur.